Filed:  2/24/16  Unmodified opinion attached

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re K.S., a Person Coming Under the Juvenile Court Law. | H042339<br>(San Benito County<br>Super. Ct. No. JV-14-00024) |
| SAN BENITO HEALTH AND HUMAN SERVICES AGENCY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>A.S.,<br><br>Defendant and Appellant. | ORDER MODIFYING OPINION AND DENYING REHEARING [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on January 27, 2016, be modified in the following particulars:

1.     On page 1, line 1, change "Andrea S." to "Mother A.S."

2.     On page 1, line 9, change "Andrea S." to "A.S."

3.     On page 2, line 1, change "Andrea S. (mother)" to "A.S. (hereafter mother)"

4.     On page 2, line 2, delete "Kaiser Permanente"

5.     On page 2, lines 2 – 3, change "Kaiser medical facility" to "covered medical facility"

6.    On page 2, line 3, change "Kaiser pediatric psychiatric clinic" to "covered pediatric psychiatric clinic"

7.    On page 2, line 5, delete "with Kaiser"

8.    On page 2, lines 11 – 12, delete "for Santa Clara County"

9.    On page 4, lines 11 – 12, delete ", who worked for the Department of Corrections and Rehabilitation,"

There is no change in the judgment.

The petition for rehearing is denied.


_____

Rushing, P.J.


_____

Márquez, J.


_____

Grover, J.

Filed: 1/27/16 Unmodified opinion
**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re K.S., a Person Coming Under the Juvenile Court Law. | H042339 (San Benito County Super. Ct. No. JV-14-00024) |
| SAN BENITO HEALTH AND HUMAN SERVICES AGENCY, Plaintiff and Respondent, v. A.S., Defendant and Appellant. | |

Andrea S. challenges the juvenile court's assumption of jurisdiction over her daughter, K.S., under Welfare and Institutions Code section 300. She also challenges the disposition order continuing jurisdiction and removing K.S. from her custody. Respondent San Benito Health and Human Services Agency defends the juvenile court's orders, and K.S. has not participated in this appeal. Finding no reversible error, we will affirm.

## I. BACKGROUND

K.S. was removed from an abusive home when she was four. At age five she was placed with Andrea S. who adopted her a year later. K.S. is a special needs child diagnosed with reactive attachment disorder, attention deficit hyperactivity disorder, post traumatic stress disorder, and a learning disorder. Those special needs qualified K.S. for financial assistance through the state's Adoption Assistance Program.

Andrea S. (mother) raised K.S. in Hollister. The first two years after her adoption, K.S. was on mother's Kaiser Permanente health insurance plan. The closest Kaiser medical facility was in Gilroy and the closest Kaiser pediatric psychiatric clinic was in San Jose, but no one on that staff specialized in reactive attachment disorder. After two years with Kaiser, mother switched K.S. to Medi-Cal (covered by the Adoption Assistance Program) so K.S. would have access to routine medical care and mental health services in San Benito County and to specialized medical care throughout the state. San Benito County Behavioral Health (Behavioral Health), the county's designated Medi-Cal mental health services provider, became K.S.'s mental health services provider. Behavioral Health did not offer treatment for reactive attachment disorder. Mother, a licensed social worker who had worked as a child protective services social worker for Santa Clara County, was familiar with residential treatment programs in Monterey and Santa Clara counties that would address reactive attachment disorder, and she felt K.S. was legally entitled to that specialized treatment.

When K.S. was nine an Adoption Assistance Program assessment identified problem behaviors such as chronic lying and stealing, aggression, problems with peers, property destruction, enuresis, and sexualized behavior. In seventh grade K.S. brought a knife to school that she claimed to be carrying for protection. K.S. started ninth grade in 2014. In September of that year she was assaulted by an 11-year-old girl, a runaway companion, resulting in a fractured nose. By December of that year she had run away several times. According to mother, K.S. was having difficulty adjusting to high school. A school mate was pressuring her to have sex with him, and she was carrying knives for protection. K.S. had also been a suspect in a burglary and theft case.

K.S. ran away Saturday, December 6, 2014, spent the night with a boy in an abandoned house, and returned home the next day with three large knives. On Monday, December 8, school staff contacted mother after finding a note K.S. had written to a friend saying "When you get this I will be dead!" K.S.'s Behavioral Health therapist was

2

unavailable that day so K.S. was assessed by a crisis counselor and determined not to be a danger to herself or others.[1]  Mother disagreed with that assessment.  Given K.S.'s at-risk behaviors, she felt K.S. should be placed on a psychiatric hold, and she refused custody of K.S. because she could not ensure her safety.  Without the ability to hold K.S., the Behavioral Health treatment team's only recourse was to discuss a safety plan with K.S. in the event she ran away again.  Staff asked K.S. to sign a "No Harm Agreement" and to call her mother every hour if she ran away.  Mother felt this plan did not assure K.S.'s safety, and she refused to take her home.  Police were called and K.S. was placed in protective custody.

K.S. was in foster care for two months, living in a home in Los Banos with several teenage boys.  After the January 2015 jurisdiction hearing, she was placed with her biological aunt in Sacramento.

## II.  TRIAL COURT PROCEEDINGS

On December 11, 2014, the Agency filed an amended juvenile dependency petition alleging that K.S. came within the jurisdiction of the juvenile court under Welfare and Institutions Code section 300, subdivisions (c) and (g).[2]  At the December 11 detention hearing mother was still unwilling to take custody of K.S., who had been placed in a foster home in Los Banos.  K.S. was detained, the court ordered reunification services, and it set a jurisdiction hearing for January 5, 2015.

On January 5 mother requested that the petition be dismissed because she planned to move with K.S. to Sacramento where K.S. would have extended family support and

---

[1] K.S. later told Agency staff that she runs away because her mother is judgmental and difficult.  She did not deny her at-risk behaviors—breaking into abandoned homes, drinking beer, smoking marijuana, stealing, and carrying knives.  But she did deny being suicidal, claiming that her mother misunderstood and overreacted to the note.

[2] Unspecified statutory references are to the Welfare and Institutions Code. Unspecified subdivisions refer to section 300.

access to mental health treatment, and she would be removed from the violence and harassment in Hollister. Mother had made arrangements for K.S. to live with her biological aunt in Sacramento until she could relocate. And K.S., who on two previous occasions had told the social worker that she did not want to return to mother's care, told mother that morning that she wanted to return home. The court continued the matter because mother had not discussed her dismissal request with her attorney.

## A.   THE JURISDICTION HEARING

At a contested jurisdiction hearing held on January 26, mother again asked that the petition be dismissed because she was capable of parenting K.S. with an appropriate safety plan. She testified that she had arranged for K.S. to live with her aunt in Sacramento where appropriate mental health services were available. Mother, who worked for the Department of Corrections and Rehabilitation, would relocate to Sacramento as soon as she could obtain a job transfer. In the meantime, she planned to visit and participate in treatment with K.S. every weekend. Mother had obtained referrals to Sacramento mental health services specializing in reactive attachment disorder. K.S.'s aunt had a long-term and supportive relationship with mother, and mother and K.S. were both close with her. Mother intended to give the aunt K.S.'s Adoption Assistance Program grant money and authorize the aunt to obtain needed services. Mother testified that K.S. was not doing well in her current placement—sharing a foster home with five teenage boys. On December 10 mother had provided the Agency with contact information for the biological aunt, but K.S. had remained in the Los Banos placement hoarding knives, being harassed by the boys, and not receiving individual or family therapy.

K.S.'s aunt, who lived with her husband and adult son, testified that her home was open to K.S., and she would work with mother to facilitate K.S.'s treatment and therapy. Although the aunt understood that mother's plan was to quickly reunite with K.S., if that did not happen the aunt was willing to put K.S. on her insurance plan and, with or

4

without a guardianship, have K.S. live with her until she became an adult. K.S. had been in the aunt's custody before her placement with mother. K.S. had not visited Sacramento in several years but her aunt had recently visited her in Hollister.

K.S.'s attorney made an offer of proof that K.S. "would like to go to Sacramento and be with her aunt." K.S. corrected her attorney, explaining "I wouldn't like to live with my aunt. I would like to be released to my mother because I feel that I trust her more. And we're working on our problems, and it's better if we're together and we work on our problems together instead of being apart. It's a lot harder for me."

The court interrupted the Agency's summation, asking "Isn't this a lot like the dirty house that's been cleaned up by the time we get to hearing? [¶] … [¶] She's not refusing to take her; she wants her back. [¶] … [¶] And she has a plan." The Agency argued that "the issues [were] still there," K.S.'s extended contact with her aunt was not recent, and mother's plan was not realistic. At the same time, the Agency argued that if the court were to take jurisdiction, it was considering the same aunt for placement. Jurisdiction would provide the Agency the opportunity to make sure the aunt had appropriate services to maintain the placement, and it would provide a safety net for K.S. in the event aunt could not care for her.

During mother's closing summation the court voiced a concern that K.S. now wanted to be with mother but mother wanted to send her to a place with no recent familiarity. Mother's counsel suggested mother explain her timetable, and a colloquy ensued,[3] in which mother was repeatedly asked to stop talking over the court and warned

---

[3] We include the full text of the exchange between mother and the court here: "[Mother] It's as soon as I can get up there. It's just not safe for her to be here in Hollister. She's not getting -- [The Court] As soon as you can get up there? Don't you have vacation? Don't you have family care leave? [Mother] I have the AAP grant to use for -- [The Court] No, just forget her grant. Can you take off work -- [Mother] I'm saying -- [The Court] -- and go up there and take care of what you need to do for your daughter in a week? [Mother] I'm saying all the time I used to have I used up to take

*(Continued)*

5

that further inappropriate conduct could result in contempt.  The court again warned mother, when she interrupted the closing summation by K.S.'s counsel, that she was acting inappropriately and suggested that K.S. leave the courtroom.  Mother responded: "So you can yell at me without being in front of her.  Fine."

The court found insufficient evidence to sustain the subdivision (g) allegation. Regarding the subdivision (c) allegations, the court ruled: "I was leaning toward, frankly, that there wasn't any evidence for [(c)], because it appeared that [mother] was willing to take the child basically after she had refused to take the child home previously.  And I'm looking to see – the child is suffering or is at substantial risk of suffering serious emotional damage, and I think we've got that.  But it has to be because the child has no parent or guardian capable of providing the appropriate care.  On the one hand, it sounds

care of her.  All her child care people have quit.  All her AAP grant used to go to child care and summer camp and horseback riding and swimming lessons and specialized services for her, and tutoring.  [The Court]  Hold on.  [Mother]  I've used to spend it all on that, but then -- [The Court]  I'm not asking you that.  [Mother]  -- they all quit on me.  [The Court]  Stop, stop, stop.  [Mother]  Now I spend it -- [The Court]  Stop, stop. [Mother]  -- on taking time off work.  [The Court]  Stop.  Do you know what the word 'stop' means?  Now I see why you had so much trouble with mental health.  Okay.  You have a one-track mind.  It was evident when you were testifying.  When all of a sudden questions came up and you were forced to deal with the issues, then you -- [Mother]  I'm tired of people listening -- [The Court]  You do not listen.  [Mother]  -- to themselves instead of me.  [The Court]  You want to go to jail next?  [Mother]  That would be great. [The Court]  That's the next step here if I have to hold you in contempt.  You need to be quiet, and you need to grow up like a big person and not interrupt me in the courtroom or you will be facing potential contempt and going to jail, in which case you're going to have worse trouble.  Don't make it worse.  Don't make your daughter have to have this problem.  She's seen this exchange.  It's not good for her.  [¶]  Okay.  Here's the deal. Instead of being excitable I want you to calm down.  I don't want to hear you going on and on.  I want to know this:  When can you be with her?  That's the question.  [Mother] How long?  As soon as I can.  [The Court]  The number of days.  Can you give me an estimate of time?  [Mother]  I don't know how long it will take me to sell my house and get a new job.  I don't know.  Do I know that?  I don't.  [The Court]  I see.  That helps.  I understand why you don't know.  That could go on a very long time, especially in today's market."

like she is. She is now willing to go up and try to provide care. I'm not 100 percent certain that there is enough money to provide the appropriate care [pause], with the payments that are received. There's been insufficient information in that regard. I'm also not convinced that mother doesn't have her own concerns that are impacting, frankly, a logical, rational approach. Mom's conduct in court has been inappropriate. She has clearly demonstrated her embroilment with the mental health department. She couldn't even, in a court setting, follow basic instructions from myself until I had to raise my voice, and even then she kept trying to talk over me and trying to talk louder than me. Her voice became agitated on the record during her testimony when she reached a point where she wasn't being heard on a question. I'm concerned about mom's mental health, frankly, and that that could be interfering with getting the appropriate care. Initially I thought it could happen. However, now in fact because mom had – [mother] had an inappropriate relationship with mental health[], she caused her daughter to be placed in one placement which was disruptive, as her own counsel notes, and she may obviously have suffered from being placed there, this all because she, the mom, didn't get her way at mental health, so she had to play this difficult situation out with CPS. That is a problem. That indicates to me that perhaps there is no parent right now capable of providing appropriate care. My concern is, frankly, that [K.S.] doesn't want to go up with her aunt; she would like to be with her mom. That's who she needs, her mom using the intelligence that her mom obviously has and using that in a rational manner rather than relying upon her emotions, but now mom tells us that she has to sell her house and get a new job. That is not quick timing. It's not like it's going to be a week or two. So therein lies the problem. [¶] Although I wasn't initially, before some of the final evidence came into play and seeing this whole circumstance, I'm now convinced, based on everything I've seen, that C-1 -- [Mother] Have you even read my -- [The Court] -- and C-2 are true."

7

**B.** **THE DISPOSITION HEARING**

A contested disposition hearing was held on March 16, 2015, at which time mother sought dismissal of the petition. The Agency's disposition report described mother during the course of the dependency as having "regularly blamed everyone else for the problems that exist between herself and her daughter." The report continued: "When someone of authority, whether it is at San Benito County Behavioral Health, the Agency, and even the Court, poses [a] question regarding the mother's action or inaction, they have frequently been met with a loud, aggressive, hostile response. [¶]…[¶] The mother's mental health and issues with controlling her own anger are of concern to the Agency and should be addressed during the course of this dependency. [¶] While the initial concerns focused on [K.S.'s] behaviors, the Agency strongly believes the mother has a part to play in why [K.S.] acts in the manner she does and this has not yet been addressed. Therefore, the Agency does not believe the mother has made substantive progress toward mitigating the issues which led to the Court's initial intervention."

The social worker testified on cross-examination that mother had arranged for individual counseling for herself through Kaiser and she had located reactive attachment disorder counseling for K.S. in Sacramento. The Agency was not opposed to the services mother had identified for K.S., and K.S. had started therapy. The social worker acknowledged that K.S. had displayed signs of mental anguish in Los Banos, and she had received no therapy until she resumed sessions at Behavioral Health in February. The social worker explained that the Agency had had an issue with mother wanting to discuss with K.S. what was going on in court during visitations. Initially mother was upset when she was instructed not to discuss court with K.S., but eventually she followed the Agency's direction, making substantial progress in that regard.

An Agency supervisor testified that his staff met with Behavioral Health staff immediately after K.S. was placed in Los Banos, and Behavioral Health submitted a treatment authorization request to Merced County at that time. The Agency transported

K.S. from Los Banos to Hollister to meet with a psychiatrist on January 7 and February 4. Although K.S. was scheduled for a Merced County intake appointment, those services were never utilized because the foster parents gave notice that they were no longer willing to care for her. After that notice the Agency shifted its focus to accessing mental health services in Sacramento County, and mother was very helpful and diligent in facilitating that process. K.S. was able to access mental health services in Sacramento without a treatment authorization request because her adoption was finalized in that county. Mother informed the Agency of her individual therapy through Kaiser, and the Agency approved of that treatment.

The Agency supervisor felt that court supervision was appropriate to ensure K.S. had access to appropriate care given the circumstances of K.S.'s detention and mother's acknowledged inability to keep K.S. safe in Hollister. He was unfamiliar with the court dismissing a petition and ordering the Agency to provide informal supervision services, but he believed the Agency could comply with such an order.

A licensed social worker who was mother's colleague testified on mother's behalf as an expert in child welfare. She testified that the label "foster child" can be stigmatic and potentially harmful. According to the expert, mother had completed a 10-hour trust-based parenting course for children from difficult beginnings, was engaged in individual therapy, and was starting group therapy. Mother had arranged for psychiatric services for K.S. both in San Benito and Sacramento counties, and mother and K.S. had completed intakes for reactive attachment disorder therapy in Sacramento. In the expert's opinion, K.S.'s best interest would be served by dismissal—even without informal supervision— because K.S. was going to remain in a near-kin placement with her aunt, and the aunt and mother had arranged for appropriate services for K.S. She also believed the family could manage K.S.'s care more competently than the Agency, and K.S. did not need to be a dependent child for a second time in her life. Even though she did not know K.S. well and she had never spoken with any mental health professionals in this case, the expert

9

testified that mother's refusal to take K.S. on December 8 demonstrated good parenting skills because Behavioral Health would not help K.S. She acknowledged that K.S.'s placement with her aunt was not a foster placement and that court supervision assured needed services for both parents and children.

The disposition report contained a February 18 e-mail from the aunt voicing K.S.'s request to continue living with her until mother moved to Sacramento. K.S. asked to start family therapy and discuss her return to mother's care after mother settled in Sacramento. K.S.'s counsel opposed a dismissal, arguing that K.S.'s at-risk behavior, mother's inability to control her, and mother's unrealistic expectations of Behavioral Health warranted continued court supervision.

The court rejected mother's dismissal request, explaining that mother, by refusing to take K.S. home from Behavioral Health on December 8, had used K.S. as a pawn knowing that K.S. would be traumatized by protective custody. The court viewed mother's objection to court supervision as stubbornness and a failure to put K.S.'s interests before hers. Adopting the findings and orders contained in the disposition report, the court declared K.S. a dependent, continued K.S.'s placement with her aunt, and continued family reunification services.

## III. DISCUSSION

### A. JURISDICTION CHALLENGES

#### 1. Standard of Review

Statutory bases for jurisdiction are reviewed for substantial evidence. (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 820.) We must determine whether "there is any substantial evidence, that is, evidence which is reasonable, credible, and of solid value" to support jurisdiction under subdivision (c). (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393.) The trial court's judgment is presumed correct. (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 267.) All conflicts are resolved in

favor of the judgment and all legitimate inferences are indulged in to uphold the juvenile court's determinations. (*In re Rocco M*., at p. 820.)

The Agency has the burden of establishing that the basis for jurisdiction exists at the time of the adjudication hearing. (*In re Chantal S.* (1996) 13 Cal.4th 196, 210; *In re Rocco M*., *supra*, 1 Cal.App.4th at p. 820.) "In evaluating risk based upon a single episode of endangering conduct, a juvenile court should consider the nature of the conduct and all surrounding circumstances. It should also consider the present circumstances, which might include, among other things, evidence of the parent's current understanding of and attitude toward the past conduct that endangered a child." (*In re J.N.* (2010) 181 Cal.App.4th 1010, 1025–1026.)

### 2. Substantial evidence

Mother argues that the court's jurisdiction finding was not supported by substantial evidence. Subdivision (c) requires a showing that K.S. "is suffering serious emotional damage, or is at substantial risk of suffering serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others" and that either the parent is causing the emotional damage or the parent is not capable of providing appropriate mental health treatment. (*In re Alexander K*. (1993) 14 Cal.App.4th 549, 557.) Here the petition alleged that mother is not capable of providing appropriate care.[4]

---

[4] We note that the Judicial Council form petition (Form JV-122) provides two options for subdivision (c) jurisdiction—that the child suffers or is at risk of suffering serious emotional damage either (1) "as a result of the conduct of the parent or guardian," or (2) "because the child has no parent or guardian capable of providing appropriate care." In this case the social worker checked the second "because" box. But the statute does not require that the emotional damage *result from* the parent's inability to provide appropriate care, only that the parent is not capable of providing care for the emotional damage. We will therefore disregard the causal language in the form petition and determine whether the record supports the proper criterion under the statute: whether mother is capable of providing appropriate care for K.S.

11

Mother does not dispute that K.S. suffers or is at risk of suffering serious emotional damage. She argues that any bases for jurisdiction that existed when K.S. was taken into protective custody on December 8 no longer existed on January 26 when the court made the jurisdiction finding. According to mother, insufficient evidence supports the court's finding that she is incapable of providing K.S. with appropriate mental health care in light of her plan for K.S. to move to Sacramento.

Here the record shows more than an isolated incident of mother impeding K.S.'s mental health treatment. Indeed mother never secured specialized therapy for K.S.'s reactive attachment disorder, even though she was aware of reactive attachment disorder treatment options in Monterey and Santa Clara counties and had been receiving a sizable monthly grant for K.S.'s special needs since at least 2009.

Mother's relationship with Behavioral Health—mental health professionals who had been overseeing K.S.'s treatment for several years—was impeding K.S.'s therapy. According to the jurisdiction report, mother felt Behavioral Heath was disempowering her by aligning with K.S. Mother wanted Behavioral Health to set boundaries for and admonish K.S.'s unacceptable behavior and illegal high risk activities, even though Behavioral Health's clinical supervisor had informed mother that it was her responsibility and not the role of a mental health clinician to tell a child what is okay and not okay and provide consequences for bad behavior. K.S.'s individual therapist felt mother was frustrating her treatment by using therapy as a consequence for bad behavior. Mother had not been internalizing feedback regarding the role of a therapist in disciplining and setting boundaries for K.S., and she and K.S. had not been engaged in family therapy for several months.

Mother had rejected Behavioral Health's professional assessment that K.S. did not qualify for an involuntary psychiatric hold, knowing that refusal to take K.S. home would result in the Agency taking custody of K.S. Even after a three day cooling off period, at

12

the detention hearing mother still refused to take custody of K.S. because Behavioral Health would not hospitalize her.

Mother's demeanor during the jurisdiction hearing demonstrated lack of insight that her behavior was obstructing K.S.'s ability to receive appropriate care. While we do not discount mother's love and desire to find appropriate mental health care for K.S., on this record substantial evidence supports the conclusion that mother was not capable of providing that care. Mother argues that this case is similar to *In re Brison C.* (2000) 81 Cal.App.4th 1373, but that case addressed the sufficiency of evidence to support a finding that the child suffered or was at substantial risk of suffering serious emotional damage under subdivision (c). Mother does not contest that finding here.

### 3. Due Process

Mother argues that her due process rights were violated because the court relied on a basis never alleged in the petition—her mental health—to sustain subdivision (c) jurisdiction. The court expressed a concern for mother's mental health based on her in-court demeanor. That demeanor is relevant to mother's insight into her past conduct (*In re J.N.*, *supra*, 181 Cal.App.4th at pp. 1025–1026) and its effects on K.S.'s access to appropriate mental health services. As we have explained, mother's decisions regarding K.S.'s mental health care and mother's disregard for Behavioral Health's guidance and assessments support jurisdiction here. The court's added observations about mother's demeanor and mental health merely support that finding; we do not interpret the juvenile court's comments as asserting an additional basis for jurisdiction.

## B. DISPOSITION CHALLENGES

### 1. Denial of Section 390 Dismissal Request

Mother argues that substantial evidence does not support the denial of her request to dismiss the petition at the disposition hearing under Welfare and Institutions Code section 390. Section 390 provides that the juvenile court "may dismiss [a section 300]

13

petition or may set aside the findings and dismiss the petition if the court finds that the interests of justice and the welfare of the minor require the dismissal, and that the parent or guardian of the minor is not in need of treatment or rehabilitation."

### a. Standard of review

As a threshold matter, we conclude that abuse of discretion, not substantial evidence, is the proper standard of review of the denial of a request to dismiss a dependency petition. Section 388, subdivision (a)(1) provides that a parent may petition the juvenile court "to set aside any order of court previously made or to terminate the jurisdiction of the court." That section encompasses a dismissal under section 390 (see *In re Marcus G.* (1999) 73 Cal.App.4th 1008, 1014), and the grant or denial of a motion under section 388, subdivision (a)(1) is generally reviewed for an abuse of discretion. (*In re Amber M.* (2002) 103 Cal.App.4th 681, 685; *In re Y.M.* (2012) 207 Cal.App.4th 892, 920; *In re S.M.* (2004) 118 Cal.App.4th 1108, 1119.) Further, the juvenile court is vested with " 'very extensive discretion in determining what will be in the best interests of a child,' " and that determination will not be reversed absent a clear abuse of discretion. (*In re Eric. B.* (1987) 189 Cal.App.3d 996, 1005.)

Although the substantial evidence standard may apply to an order *granting* a request to dismiss a dependency petition (see *In re Marcus G.*, *supra*, 73 Cal.App.4th at p. 1014), that standard is not appropriate to review the *denial* of a dismissal request. As this court has aptly explained, "where the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals, it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment." (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528.)

### b. Analysis

The juvenile court did not abuse its discretion by denying mother's dismissal request. The court had an interest in seeing that K.S. receive and engage in appropriate mental health treatment and that mother develop skills to support K.S.'s mental health

14

needs. The court also did not misinterpret relevant law regarding informal supervision—section 301—in denying mother's dismissal request. Although the Agency supervisor testified that San Benito County did not have an informal supervision program, he also testified that the Agency would implement any court order incorporating voluntary services. The record shows the court denied mother's dismissal request, which included participation in informal services under section 301, because it was in K.S.'s best interest for the court to supervise her treatment and reunification.

### 2. Disposition Findings and Order

Section 360 authorizes the juvenile court to adjudge a child described by section 300 to be a dependent of the court. (§ 360, subd. (d).) The juvenile court adjudged K.S. a dependent of the court, and it adopted the findings recommended in the Agency's disposition report, including finding by clear and convincing evidence that removal was warranted under section 361, subdivisions (c)(1) and (c)(3). " 'We review an order removing a child from parental custody for substantial evidence in a light most favorable to the juvenile court findings.' " (*In re A.R.* (2015) 235 Cal.App.4th 1102, 1116.)

### a. Removal under section 361, subdivision (c)(3)

Section 361, subdivision (c)(3) authorizes the removal of a child from the physical custody of her parent when the child "is suffering severe emotional damage, as indicated by extreme anxiety, depression, withdrawal, or untoward aggressive behavior toward himself or herself or others, and there are no reasonable means by which the [child's] emotional health may be protected without removing the [child] from the physical custody of his or her parent or guardian." Mother does not dispute the emotional damage finding, and the no reasonable means finding is support by substantial evidence. Mother insists that K.S. was not safe in her physical custody and that, even if the petition were to be dismissed, K.S. would remain in the custody of her aunt. But mother's failure to secure specialized therapy for K.S.'s reactive attachment disorder, her failure to follow

15

advice from K.S.'s mental health team in San Benito County, and her rejection of Behavioral Health's December 8 dangerousness assessment supports a finding that supervision is necessary to assure K.S.'s access to and engagement in appropriate mental health services.

Mother argues the Agency failed to make reasonable efforts to avoid K.S.'s removal. Mother points to what she describes as "the [A]gency's ineptitude" in providing services for K.S. during her initial detention—K.S.'s placement in foster care together with several teenage boys where her at-risk behaviors continued and she received no therapy. But a questionable foster placement and a gap in therapy does not undercut the "no reasonable means" finding. Mother has failed to show how the circumstances of the initial detention and placement—however flawed—impacted the existence of any reasonable means of protecting K.S. without removing her from mother's care after she had been declared a dependent. Mother also points to her own role in locating appropriate mental health service providers for K.S. in Sacramento. But mother's identification of service providers does not amount to a reasonable means of protecting K.S. on this record, nor does it obviate the need to remove K.S. from the physical custody of her mother to protect her emotional health, as we have already discussed.

We reject mother's argument that the trial court understood "reasonable means" in section 361, subdivision (c) as requiring mother to have made reasonable efforts to provide K.S. with appropriate mental health care before the petition was initiated. During mother's closing summation, the juvenile court observed that nothing had prevented mother from arranging mental health care for K.S. in Sacramento before the Agency intervened on December 8. But that comment appears to have been made in response to Mother's point that K.S.'s services were delayed two months even with court supervision. We do not interpret it as reflecting a misinterpretation of section 361, subdivision (c).

16

We also reject mother's argument that the court inappropriately focused on her "unwavering stubbornness" instead of the evidence presented at the disposition hearing showing that mother had arranged for mental health services in Sacramento for K.S. faster than the Agency was able to secure the same services. Our role as a reviewing court is not to reweigh competing evidence. Our task is to determine whether the record contains substantial evidence to support the juvenile court's disposition decisions. As we have explained, notwithstanding evidence of mother's laudable efforts to secure services for K.S. in Sacramento, the record sufficiently supports the juvenile court's conclusion that K.S. is suffering or is at risk of suffering severe emotional damage and there are no reasonable means to protect K.S.'s emotional health without removing her from mother's custody.

### b.      Removal under section 361, subdivision (c)(1)

The juvenile court found removal warranted under section 361, subdivision (c)(1), which requires a showing that "a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor [exists] if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's or guardian's physical custody." The Agency argues that jurisdiction findings are prima facie evidence that a child cannot safely remain in a parent's care under section 361, subdivision (c)(1). But that prima facie finding only applies to a jurisdiction finding under section 300, subdivision (e) that a child under five years old has been physically abused. (§ 361, subd. (c)(1).) We are not satisfied that the record supports the juvenile court's finding by clear and convincing evidence that removal from mother's care was required to protect K.S.'s *physical* health, and we will order it stricken. However, the elimination of that finding does not affect the validity of the disposition order based on section 361, subdivision (c)(3).

17

## IV.  DISPOSITION

The jurisdiction order is affirmed.  The disposition order is modified to strike finding 11; as modified, that order is affirmed.

_____
Grover, J.

**WE CONCUR:**


_____
Rushing, P.J.



_____
Márquez, J.

18

| | |
|---|---|
| Trial Court: | San Benito County Superior Court<br>Superior Court No. JV-14-00024 |
| Trial Judge: | Hon. Steven Sanders |
| Counsel for Plaintiff/Respondent:<br><br>San Benito County Health and Human Services Agency | Irma Valencia, Deputy County Counsel<br>Office of the County Counsel<br>County of San Benito |
| Counsel for Minor:<br><br>K.S. | No appearance for Minor |
| Counsel for Defendant/Appellant:<br><br>A.S. | Karen Joan Elcaness<br>in association with<br>Sixth District Appellate Program |