Filed 10/7/16  In re F.M. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re F.M., et al., Persons Coming Under the Juvenile Court Law. | |
| | D069777 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. NJ13425B-E) |
| v. | |
| F.A.M., | |
| Objector and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Michael J. Imhoff, Commissioner.  Affirmed.

Monica Vogelmann, under appointment by the Court of Appeal, for Objector and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, Tahra C. Broderson, Deputy County Counsel, and Silvia Paz Romero, Volunteer Deputy County Counsel.

F.A.M. (Mother), the mother of four dependent children of the juvenile court, appeals from an order denying her Welfare and Institutions Code section 388[1] petition to change an order of the court that terminated her reunification services and set the section 366.26 selection and implementation hearing. Because the juvenile court did not abuse its discretion in denying the requested relief, we will affirm.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

Mother is the mother of the four dependent minors: twins R.M. and F.M. (age seven); F.A.M.M. (age five); and S.M. (age two) (together Minors).[3]

---

[1] Subsequent undesignated statutory references are to the Welfare and Institutions Code.

[2] "In accord with the usual rules on appeal, we state the facts in the manner most favorable to the dependency court's order." (*In re Janee W.* (2006) 140 Cal.App.4th 1444, 1448, fn. 1.)

[3] Mother is also the mother of two other children. She has a son (age 10), who in an earlier dependency case was taken into protective custody based on a substantiated allegation of neglect. Mother relinquished her parental rights to the boy, and he was adopted in 2008 before the births of the children involved in the present case. She also has a daughter (age 1), who was born during the reunification period in the present case. (See pt. II.D., *post*.)

A.      *The Petitions (Sept. 14, 2014)*

In mid-September 2014 — i.e., when R.M. and F.M. were five years old, F.A.M.M. was three years old, and S.M. was two months old — the San Diego County Health and Human Services Agency (Agency) received multiple referrals regarding the Minors through the child abuse hotline. The Agency followed up with an investigation that included making unannounced home visits and contacting health care professionals who had been seeing the children.

The first child abuse hotline referral reported that R.M. had missed the last six days of school, and when he returned he had bug bites all over his body.

That same day, the social worker made an unannounced visit at Mother's residence. Mother had open sores and pupils that were not visible, which caused the social worker to be concerned about Mother's possible drug use. At first Mother told the social worker she was breastfeeding S.M., but when the social worker explained the potential problems with breastfeeding and methamphetamine use (i.e., passing methamphetamine to the baby), Mother changed her story and said she was not breastfeeding.

The home had very limited food for the children. The children had dirt caked on their hands, feet, legs and faces. R.M. and F.A.M.M. were "delayed";[4] and F.M. would not speak. S.M. had a diaper rash and scratches on her face that Mother could not explain, and S.M. did not respond to the social worker's effort to engage her. R.M. had

---

[4]      The social worker did not describe the behaviors that led to this conclusion.

multiple bug bites (some very inflamed), and his diaper was saturated and sagging. In response to the social worker's suggestion that R.M. and S.M. be seen by a doctor, Mother did nothing that day; rather, the next day, she had her friend, Lisa M., take R.M to the doctor. Lisa M. was a known drug addict who had been arrested three months earlier — with R.M. and F.M. in her custody — on charges of child endangerment, being under the influence of a controlled substance and possession of drug paraphernalia.

The second child abuse hotline referral was received after Lisa M. brought R.M. to the doctor. The referral reported that R.M. was covered in flea bites all over his body and had multiple infections. Lisa M. explained that they sleep on the floor, and there are fleas everywhere. The referral also reported that R.M. appeared as if he had not been bathed in weeks. R.M. was extremely thin, registering in the 50th percentile for height and fifth percentile for weight. Lisa M. had bags of candy from which she was feeding R.M. and explained that he eats " 'whatever we have around.' " Lisa M. did not seem competent to care for R.M.

Later that same day, the social worker contacted R.M.'s doctor, who expressed the following concerns: R.M. had not gained much weight during the prior year; a week earlier Lisa M. brought in the twins (R.M. and F.M.) because they were vomiting, yet at the same time Lisa M. was feeding them Hot Cheetos and candy; and R.M. was not receiving services for his special needs at home or at school. Although the social worker's report did not explain what the doctor considered R.M.'s special needs to be, in a written report provided the following day, the doctor referred to R.M.'s "intellectual disability."

After receiving the written report about R.M., the social worker contacted the doctor's office to inquire about S.M.  The receptionist stated that S.M. missed an appointment that had been scheduled for the prior day.

Based on the foregoing information, on September 16, 2014, the Agency filed the underlying petitions on behalf of the Minors.[5]  The Agency alleged jurisdiction based on a failure to protect by not providing a suitable home under section 300, subdivision (b).[6] The Agency also filed a detention report on September 16, 2014 (September 2014 detention report) that contained the results of its investigation and interviews.

Pending the detention hearing, the Agency applied for and the court ordered a protective custody warrant for each of the Minors.

___

[5]     The Agency filed four separate petitions — one on behalf of each of the Minors — in which the substantive allegations in each are identical.  Correspondingly, following each court hearing there are four separate orders — one for each of the Minors — in which the language is identical.  For ease of reading, we will refer to only one petition or order, unless context or a specific ruling requires otherwise.

[6]     "A child who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court:  [¶]  . . .  [¶]  (b)(1) The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the . . . willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment . . . ."  (§ 300.)  At times the parties and the juvenile court cited section 300, subdivision (b), and at times they cited section 300, subdivision (b)(1).  The only relevant applicable statute is section 300, subdivision (b)(1).

B.    *The Detention Hearing (Sept. 17, 2014)*

At the detention hearing on September 17, 2014, based on the evidence in the September 2014 detention report, the juvenile court found that the Agency had made a prima facie showing on the petition and detained each of the Minors in out-of-home care.

C.    *The Contested Adjudication and Disposition Hearing (Dec. 5, 2014)*

In anticipation of the jurisdictional hearing, on October 7, 2014, the Agency prepared a lengthy jurisdiction/disposition report (Oct. 2014 jurisdiction/disposition report) based on its further investigation.

Mother began using methamphetamine at the age of 16. She had tested positive as recently as September 23 and 29, 2014, which was barely a week after the detention hearing.

The Community Services for Family case worker's principal concern was the safety of the Minors while in the Mother's house. For example, chemical flea sprays were within the Minors' reach, which presented a poisoning hazard, and dirty bath water remained in the tub without draining, which presented a drowning hazard. The social worker advised that "[t]here is substantial danger to the physical health of the [Minors] and there are no reasonable means by which the [Minors'] physical or emotional health may be protected without removing the children from [Mother's] physical custody."

R.M. was unable to communicate verbally with the social worker. He was shy, though he would join other children and seemed to understand simple instructions. The report indicated that R.M. was autistic.

F.M. told the social worker that she had two mothers — Mother and Lisa M.. Mother reported that she is not particularly attached to F.M.; rather, according to Mother, F.M. was more attached to Lisa M., who cared for F.M. when Mother was at work.[7]

F.A.M.M. also was unable to communicate verbally with the social worker, although she interacted with the social worker and responded appropriately to physical communication (a "high five").

The Minors appeared comfortable away from Mother and in their foster care placements.

At a hearing in October 2014, the juvenile court considered the September 2014 detention report and the October 2014 jurisdiction/disposition report. Mother denied the allegations in the petition. The court expressly advised Mother that because one of the Minors was under three years old and all Minors were members of a sibling group, Mother's failure to participate regularly and make substantive progress in any court-ordered treatment programs or to cooperate or avail herself of services provided as part of the child welfare services case plan could result in a termination of parental rights and a permanent plan of long-term foster care, guardianship or adoption *after only six months*. (See § 361.5, subd. (a)(3).) The court confirmed the Minors' detention, allowing Mother liberal supervised visitation. The court then continued the jurisdictional hearing until later in October.

---

[7] Mother reported having worked from September 2007 until April 2012, but can no longer work because she is not a United States citizen and does not have a work permit.

The Agency provided the juvenile court with an addendum report dated October 23, 2014 (Oct. 2014 addendum report). The social worker had been having difficulty contacting Mother. Mother visited the Minors three times between September 19 and October 15, 2014, but was late for two of the visits; and Mother failed to show up for six other scheduled visits between September 30 and October 20, 2014, calling only twice to cancel.

Mother failed to attend the continued jurisdictional hearing on October 23, 2014, and the court issued but withheld a bench warrant. At Mother's counsel's request, the juvenile court set dates for a settlement conference in November and a contested adjudication and disposition hearing on December 5, 2014.

In preparation for the settlement conference, the Agency submitted an addendum report dated November 19, 2014 (Nov. 2014 addendum report). Mother continued to be difficult to reach and rarely returned messages left by the social worker. Mother failed to attend two scheduled intake appointments with the Family Recovery Center's intake office. When she finally showed up, the center placed her on a waiting list for inpatient treatment. Although the center told Mother she could start outpatient treatment, she failed to follow up. Mother had not made significant progress with visitation, continuing to arrive late or not show up at all. The social worker suspected Mother was still using drugs, and Mother was referred to drug testing.

At the contested adjudication and disposition hearing on December 5, 2014, the juvenile court received in evidence and considered the September 2014 detention report; the October 2014 jurisdiction/disposition report; the October 2014 addendum report; and

8

the November 2014 addendum report. The court took jurisdiction, sustaining the petition and making true findings on the allegation that Mother failed to protect the Minors by not providing a suitable home under section 300, subdivision (b)(1). The court declared the Minors to be dependents of the juvenile court and directed the Agency to find suitable licensed foster care, specifically finding as to each of the Minors that there was a substantial danger to the physical health of the child or the child was suffering severe emotional damage, and there were no reasonable means by which the child's physical or emotional health could be protected without removing the child from Mother's physical custody. The court ordered Mother to comply with the reunification services consistent with her case plan and to undergo a psychological evaluation. Finally, the court set dates in June and November 2015, respectively, for the section 366.21 six-month and 12-month review hearings.

D.     *The Contested Six-Month Review Hearing (July 6, 2015)*

For the June 2015 initial review hearing, the Agency prepared and filed a status review report dated June 4, 2015 (June 2015 status review report).

In March 2015 Mother was arrested for possession of syringe, a methamphetamine pipe and a butterfly knife, and in May 2015 she was arrested for possession of narcotics and drug paraphernalia. Mother was neither working nor engaged in any of her reunification services. In late May 2015, Mother gave birth to a daughter, whose meconium tested positive for opiates and morphine. Mother admitted that she had been using methamphetamines during the pregnancy, including use two days before the child's delivery.

9

After receiving a referral to individual therapy in late 2014, Mother attended the first session, missed the next two sessions, arrived late for the fourth session and missed the fifth and sixth sessions. The therapist terminated therapy due to Mother's lack of attendance, reporting that Mother had not made any progress with the more serious issues. Similarly, Mother's services for parenting classes were terminated when Mother relapsed in late 2014, and the in-home parenting organization was unable to locate her. Despite months of encouragement from a court substance abuse specialist and the Agency social worker, Mother never began an outpatient or residential drug treatment program. Mother also failed to complete the psychological evaluation ordered by the juvenile court, even though the psychologist and the Agency social worker attempted several times to contact Mother for this purpose.

R.M. was formally diagnosed with autism and developmental delays, especially in speech. He was referred to professional care and had an IEP in kindergarten that included speech and special education services.

F.M. experienced no developmental delays, although she struggled academically in kindergarten.

F.A.M.M. was diagnosed with developmental delays and had an IEP for speech therapy and special education services at preschool. She was not fully toilet trained and screamed and threw tantrums at times. In addition, she angered easily and pulled out her hair. She began therapy in April 2015.

S.M. was referred for further evaluation after her pediatrician observed developmental delays at a routine examination in April 2015.

10

Since the last report, all four Minors had been placed together at the same foster home, and all four Minors were doing well in this placement. Despite having been offered visitation more than once a week, Mother visited the Minors fewer than five times since the prior reporting period in December 2014.

At the six-month review hearing in June 2015, the Agency "recommend[ed] that the Court terminate reunification services and set a [section ]366.26 hearing," because Mother "ha[d] not made progress with any of her case plan." Nonetheless, the juvenile court granted Mother's requests, ordering Mother to participate in the juvenile dependency drug court program and setting a contested section 366.21 six-month review hearing a month later in July 2015.

In preparation for the contested six-month review hearing, the Agency submitted a an addendum report dated July 6, 2015 (July 2015 addendum report).[8] After the initial six-month review hearing, in mid-June 2015 Mother entered a residential substance abuse treatment program. The Agency did not change its prior recommendation that reunification services be terminated. According to the Agency, Mother had a long history of substance abuse, Mother would require extensive treatment and therapy, and Mother likely could not reunify by the section 366.21 12-month review hearing.

The juvenile court conducted the contested six-month review hearing on July 6, 2015. As evidence, the court received the June 2015 status review report and the July

---

[8]    This addendum report included information and a juvenile court case number regarding Mother's daughter born in May 2015, but she is not the subject of any order on review in this appeal.

11

2015 addendum report and accepted the parties' stipulated offer of proof that, if called as a witness, Mother (who was present) would testify that, on June 10, 2015, when she entered the residential substance abuse treatment program, she called the social worker and left a message requesting visitation. After considering the evidence and the argument of counsel, the juvenile court found that Mother had not made substantive progress with the provisions of her case plan and that there was not a substantial probability that the Minors would be returned to her physical custody within the next six months. Among other orders, as relevant to the issues on appeal, the court terminated reunification services for Mother. The court then set dates in November 2015 for the section 366.26 selection and implementation hearing and the section 366.21 12-month review hearing.

D.    *The Contested Section 388 Modification Hearing and the Contested Section 366.26 Selection and Implementation Hearing (Feb. 8, 2016)*

After a number of continuances, the section 366.26 selection and implementation hearing proceeded on February 8, 2016. The facts and procedures employed prior to that hearing, however, are what are at issue in this appeal.

1.    *The Agency's Section 366.26 Report dated November 3, 2015*

In anticipation of the section 366.26 hearing, the Agency prepared and filed a section 366.26 report dated November 3, 2015 (Nov. 2015 366.26 report) in which the Agency recommended adoption as the best placement plan for the Minors.

The report traced Mother's visitation history, much of which is set forth above. In summary, despite a liberal visitation order, Mother had not visited the Minors during the four months prior to the July 2015 contested six-month review hearing and had not called

12

the Minors in over six weeks. Shortly after Mother entered the residential substance abuse treatment facility in June 2015, she scheduled two visits but cancelled one. Mother transferred to a different residential facility in August 2015 where she visited with the Minors on at least nine occasions by the time the social worker submitted the November 2015 366.26 report. The visits were consistent: the Minors were happy to go with the social worker and happy to see Mother; the Minors were just as happy to leave with no upset at all; and Mother spent a majority of the time with S.M., largely ignoring the older children — even during the times when they needed supervision. The Minors did not demonstrate a strong attachment to Mother.

All four Minors had been placed in the same foster home for almost a year and, according to the social worker, they "are a happy group, seemingly always smiling and ready to play." The caretakers reported no behavioral problems in the home. R.M. and F.M. both told the social worker they liked living with their caretakers. F.M. emphasized that in the caretakers' home there was always food and that she no longer had nightmares or was scared like in the past when she lived with Mother.

R.M. continued to be diagnosed with developmental delays in cognition and fine and gross motor skills. He was in first grade school, where he had an IEP for speech and special education services. The social worker noted that earlier reports of R.M.'s autism were not confirmed in the written documentation that accompanied the reports and that she believed this label had followed R.M. wrongly.

13

F.M., also a first grader, did not have an IEP. She showed a "strong parentified behavior," often attending to the needs of her younger siblings, F.A.M.M. and S.M. — at times more quickly than Mother during visits.

F.A.M.M. was diagnosed with developmental delays and had an IEP with a special education program at her preschool. She received speech and language services and individualized academic instruction. She could be stubborn and pout, though she had become easier to redirect. She continued to refuse to use the toilet at times.

S.M., "a happy interactive one year old," was found to have general delays in all areas. Although she was not yet walking at 16 months, she was receiving in-home infant developmental services.

The Minors were adoptable. In fact, the caretakers were interested in adopting the Minors and had completed the required initial adoption homestudy. Additionally, in San Diego County, there were 17 approved families for a sibling group of four with the Minors' specific background and risk group (five families if R.M.'s autism diagnosis were confirmed); the numbers were the same for just the twins; and individually, there were 25 possible families for just R.M. (five families if the autism diagnosis were confirmed), 30 possible families for just F.M., 41 families for just F.A.M.M., and 60 possible families for just S.M.

In recommending that the court terminate Mother's parental rights and designate adoption as the permanent plan for the Minors, the Agency reviewed Mother's relationship with the Minors and concluded, "sadly," Mother "f[e]ll very short of a safe and strong parental role." Based on the Minors' "specific need for permanence," the

14

Agency advised that "[a]doption provide[d] . . . the best plan for them."  The Agency

concluded by confirming that adoption outweighed any benefit to the Minors of

continuing their relationship with Mother.

2.      *Mother's November 25, 2015 Section 388 Petition*

The court continued the section 366.26 hearing twice, ultimately setting it for a

contested trial on February 8, 2016.   In the interim, in late November 2015, the

dependency drug court reported that Mother was doing well in her residential program

and had been sober for 147 days.

Within days of this report, Mother filed a section 388 petition in which she asked

the juvenile court to change its July 6, 2015 order (following the contested section 366.21

six-month review hearing) in which the court terminated Mother's reunification services

and set the section 366.26 selection and implementation hearing.  More specifically,

Mother asked that the court vacate the section 366.26 hearing date, reinstate reunification

services to the 18-month review date (Mar. 2016), and in the meantime allow

unsupervised and overnight visitation at the residential facility.  In support of her petition,

Mother emphasized her successes at the residential facility — i.e., sobriety, completion of

90 percent of a parenting course, and attendance at two months of individual therapy.

On December 15, 2015, after reading and considering Mother's section 388

petition and listening to the argument of counsel, the juvenile court found that Mother

15

carried her prima facie burden on the petition and set the matter for an evidentiary hearing on February 8, 2016.[9]

3. *The Agency's February 8, 2016 Addendum Report*

The Agency submitted an addendum report dated February 8, 2016 (Feb. 2016 addendum report) in which it recommended denying Mother's section 388 petition, proceeding with the section 366.26 hearing, and ordering adoption as the permanent plan.

By the time of the February 2016 addendum report, the four Minors had been in placement together for a year — where all four were "continu[ing] to do very well" — and out of Mother's home for 17 months.

The social worker had taken the Minors to Mother's residential facility, where the 23 supervised visits remained consistent:  the Minors were happy to go to the visit and responsively greeted Mother in an appropriate manner, but they were always more concerned with when the caretakers would pick them up after the Minors left the visits and spontaneously greeted the caretakers with enthusiasm.  Mother continued to spend a significant amount of the visit tending to S.M., ignoring the older three children.  The "most alarming part" about the visits was Mother's failure to supervise the Minors.  When they were outside on the playground, for example, Mother often had her back to the play area, unaware of the Minors' various stumbles, falls and potentially dangerous behaviors (e.g., using riding toys without wearing a helmet or climbing on equipment while eating

9    Also at the December 5, 2015 hearing, the juvenile court terminated Mother's (and the father's) parental relationship with her youngest — i.e., the daughter born in May 2015 — and found adoption to be in the child's best interests.

16

snacks).  As a result, the social worker reported:  "I strongly believe that the children would be at serious risk or harm if the mother had unsupervised visits, or longer visits, especially outside . . . ."

Even though the social worker commended Mother for her significant accomplishments — in particular, the 224 days of sobriety by the time of the section 388 hearing — the Agency report concluded with the assessment that returning the Minors to Mother would not be in the Minors' best interests.  Although Mother was making progress, when the Minors were with her they were at risk; Mother was still overwhelmed with caring for all four, and she was not able to alleviate or even anticipate risk to them given their activities.  In addition, Mother had not thought about, let alone begun to make, a plan for what to do after her discharge from the residential facility.  Finally, the social worker emphasized the "tremendous progress" the Minors had made over the prior year and a half outside of Mother's care.

4.    *The Contested Section 388 Petition Hearing*

At the February 8, 2016 hearing on Mother's section 388 petition, the juvenile court considered the following evidence:  Mother's section 388 petition; an e-mail from the superior court judge who was presiding over Mother's dependency drug court proceedings;[10] a letter from Mother's substance abuse counselor;[11] the November 2015

---

[10]    In an e-mail dated February 5, 2016, the judge wrote in part:  "[Mother] has made outstanding progress and is currently in Phase 3 of our program with 224 days clean as of today."  This e-mail updated a January 8, 2016 e-mail in the court's file that reads in part:  "[Mother] entered drug court on 6/5/15.  Her warmth and kindness have made her a

17

366.26 report; the November 2015 addendum report; the December 2015 addendum report; and the February 2016 addendum report.[12]  The court also listened to the argument of counsel.

The juvenile court first found that Mother met her burden of proof for showing the "change of circumstances" required under section 388, subdivision (a)(1).  However, the court then found that Mother did not meet her burden of proof for establishing that "the proposed change is in the best interests of the child" as required under section 388, subdivision (a)(2).  Stated differently, the court ruled that there was insufficient evidence that the Minors' best interests would be served by vacating the section 366.26 hearing date, reinstating reunification services to the 18-month review date, and allowing unsupervised and overnight visitation at the residential facility.

The court accordingly denied Mother's section 388 petition.

---

favorite of the participants.  She is currently doing very well in Phase 2 of our program, with 196 days clean as of today."

[11]    In a letter dated February 1, 2016, the counselor wrote that Mother actively participated in treatment and that she had completed the Orientation Phase and was then in Phase 1 of the treatment program, working on the requirements to progress to Phase 2, the final stage of residential treatment.  In addition, the counselor reported directly to the social worker (who reported to the court) that Mother "was doing 'awesome.' "

[12]    The November 2015 addendum report only deals with the fathers of the Minors, and the December 2015 addendum report only deals with compliance under the Indian Child Welfare Act of 1978 (25 U.S.C. § 1911 et seq.).  Neither report has any relevance to the issues in this appeal.

5.      *The Contested Section 366.26 Selection and Implementation Hearing*[13]

At the conclusion of the ruling denying Mother's section 388 petition, the juvenile court commenced the section 366.26 hearing.

The court considered the same evidence that the parties presented at the hearing on Mother's section 388 petition, and counsel presented argument.  The court stated its findings on the record and ordered that, as to each of the Minors, Mother's (and the father's) parental rights were terminated and a permanent plan of adoption was appropriate.

On February 8, 2016, the juvenile court filed formal orders for each of the Minors, terminating parentage and identifying adoption as the permanent plan.

II.

DISCUSSION

Mother argues that the juvenile court erred in denying her section 388 petition, because she showed that "she made outstanding progress and had over 224 days clean." (Capitalization omitted.)  According to Mother, this evidence of sobriety established that the Minors' best interests would be served by granting the relief requested in the petition. We disagree.  While Mother's admittedly "outstanding progress" is commendable, that is not the standard we apply on appeal.  As we explain, under well-established standards of

---

[13]      We do not go into any detail concerning the section 366.26 hearing, because Mother does not raise any issue of error in this proceeding.  Mother and the Agency agree that if we reverse the denial of the section 388 petition, we necessarily must vacate the section 366.26 order.  Since the order denying the section 388 petition will not be reversed, we express no opinion on the parties' agreement.

appellate review, we determine only whether the juvenile court abused its discretion; we do not reweigh the evidence or substitute our judgment for that of the juvenile court. Accordingly, we will affirm.

A.     *Law*

Section 385 authorizes the juvenile court to change, modify or set aside a prior juvenile court dependency order at any time.  A parent's showing of "change of circumstance or new evidence" (§ 388, subd. (a)(1)) will support such relief upon the further showing that "the proposed change is in the best interests of the child" (§ 388, subd. (a)(2)).  (*In re J.C.* (2014) 226 Cal.App.4th 503, 525 (*J.C.*); Cal. Rules of Court, rule 5.570(e)(1).)  As applicable here, even after reunification services have been terminated, section 388 provides an " 'escape mechanism' " for a parent to revive the reunification issue by allowing the court to consider changed circumstances or new information.  (*In re Marilyn H.* (1993) 5 Cal.4th 295, 308-309 (*Marilyn H.*).)

We review the denial of a section 388 petition for an abuse of discretion.  (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318 (Stephanie M.) [§ 388 petition to change placement]; *J.C., supra,* 226 Cal.App.4th at p. 525 [§ 388 petition to change custody and vacate § 366.26 hearing].)  Where, as here, the juvenile court exercises its discretion in a dependency proceeding, " ' "a reviewing court will not disturb that decision unless the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination [citations]." ' [Citations.]  . . . '["]When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' "  (*Stephanie M.*, at pp. 318-319.)  As

20

applicable to the specific issue on appeal (see pt. II. B., *post*), "the juvenile court is vested with ' "very extensive discretion in determining what will be in the best interests of a child," ' and that determination will not be reversed absent a clear abuse of discretion." (*In re K.S.* (2016) 244 Cal.App.4th 327, 340 (*K.S.*).)[14]

An order denying a petition under section 388 to modify a prior order of the juvenile court is appealable under section 395, subdivision (a)(1). (*In re K.C.* (2011) 52 Cal.4th 231, 235-236.)

B.     *Analysis*

Here, the juvenile court found that, by presenting the evidence related to her sobriety, Mother met her burden in establishing the requisite "change of circumstance or new evidence" for section 388 relief. (See § 388, subd. (a)(1); *J.C., supra,* 226 Cal.App.4th at p. 525.) Thus, the only issue on appeal is whether the juvenile court abused its discretion in finding that the Minors' best interests would not be served by vacating the section 366.26 hearing date, reinstating reunification services to the 18-

---

14     The parties agree on this standard of review. We disagree, however, with Mother's suggestion that, in the context of our review of the order *denying* the section 388 petition, our determination whether the juvenile court abused its discretion includes a review of the juvenile court's findings for substantial evidence. Where, as here, the trier of fact has expressly ruled that the party with the burden of proof did not carry her burden and that party appeals a ruling being reviewed for an abuse of discretion, " 'it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment.' " (*K.S., supra,* 244 Cal.App.4th at p. 340 [denial of a § 388 petition]; compare *ibid*. [consideration of substantial evidence may apply to appellate review of an order *granting* a § 388 petition].)

month review date, and allowing unsupervised and overnight visitation at the residential facility. (See § 388, subd. (a)(2); *J.C.,* at p. 525.)

Mother suggests that, in evaluating the Minors' bests interests, we apply the factors set forth in *In re Kimberly F.* (1997) 56 Cal.App.4th 519 (*Kimberly F.*). Those factors include: "(1) The seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children to *both* parent and caretakers; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been." (*Ibid.* at p. 532.) We decline to apply the *Kimberly F.* factors here because, those factors do not sufficiently take into account our Supreme Court's guidance on the appropriate standard to be applied.

"After the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount." (*Stephanie M., supra,* 7 Cal.4th at p. 317.) That is because: "*Once reunification services are ordered terminated, the focus shifts to the needs of the child for permanency and stability*." (*Marilyn H., supra,* 5 Cal.4th at p. 309, italics added.) Accordingly, when considering a section 388 petition that requests the reopening of reunification services after the setting of the section 366.26 selection and implementation hearing, the juvenile court "*must recognize this shift of focus* in determining the ultimate question before it, that is, the best interests of the child." (*Stephanie M.,* at p. 317, italics added.) This shift in focus is required because, "after a child has spent a substantial period in foster care and attempts at reunification have proved fruitless, *the child's interest in stability outweighs the*

22

*parent's interest in asserting the right to the custody and companionship of the child*."
(*In re Jasmon O.* (1994) 8 Cal.4th 398, 419-420 (*Jasmon O.*), italics added.)

In declining to apply the *Kimberly F.* factors, we instead will follow our Supreme Court's directives in *Marilyn H*., *Stephanie M.* and *Jasmon O.*, set forth in the preceding paragraph, and decide whether the juvenile court here abused its discretion in ruling that Mother failed to prove that reopening reunification efforts and vacating the section 366.26 hearing would advance "the needs of the [Minors] for permanency and stability." (*Marilyn H., supra,* 5 Cal.4th at p. 309; accord, *J.C., supra,* 226 Cal.App.4th at p. 527 [holding, "after reunification services have terminated, a parent's petition for . . . an order . . . reopening reunification efforts must establish how such a change will advance the child's need for permanency and stability"].)

Under this standard, we have no difficulty concluding that the juvenile court did not abuse its discretion in denying Mother's section 388 petition. Even in the controlled setting of the residential facility, the Minors remained at risk when in Mother's care; Mother was still overwhelmed with caring for all four Minors, and she was not able to alleviate or even anticipate risk to them based on their activities. In addition, Mother had not thought about, let alone begun to make, a plan for either herself or the Minors after her discharge from the residential facility; and the record contains no evidence of Mother's stability outside of the residential facility.[15] The Minors — each of whom

---

[15]    In its original petitions, the Agency alleged jurisdiction based on a failure to protect by not providing a suitable home. (§ 300, subd. (b)(1).)

experienced developmental delays, some serious, prior to their removal from Mother's custody — had made "tremendous progress outside of [Mother's] care," where "[t]he caretakers have managed the many services and incorporated them into their daily lives without complaint." Finally, the Minors' bond and attachment to the caretakers well exceeded their bond or attachment to Mother.[16] The juvenile court correctly considered these concerns in advancing the Minors' needs for permanency and stability.

Even if we consider Mother's argument under the *Kimberly F.* factors, the result is no different. For the first and third factors, Mother emphasizes the outstanding progress she made in dealing with her drug addiction. For the second factor, Mother focuses on the Minors' happiness in seeing their Mother during visitation. Mother concludes by arguing that, because the record contains evidence of these facts, granting Mother's section 388 petition "would promote the best interests of her children." However, Mother does not explain *how* these facts support a finding that the best interests of the Minors would be served in reinstating reunification services and delaying a permanent plan. Moreover, even if we assume that all three factors weighed in favor of promoting the Minors' best interests, that does not mean the juvenile court erred in denying the requested relief. For us to conclude that the juvenile court abused its discretion based on Mother's presentation, we would have to reweigh the evidence and substitute our decision

_____

16    We are aware that the determination of a child's best interests cannot be based on a comparison of the parent's and the caretakers' respective socioeconomic status. (*Kimberly F., supra,* 56 Cal.App.4th at p. 529.) However, the nature and extent of the child's bonding and attachment to the caretakers *is* a proper and necessary consideration. (*Jasmon O., supra,* 8 Cal.4th at pp. 418-419.)

24

for that of the juvenile court — which we may not do.  (*Stephanie M., supra,* 7 Cal.4th at p. 319.)

For the foregoing reasons, the juvenile court's decision to deny Mother's section 388 petition was neither arbitrary, capricious nor patently absurd.  To the contrary, the court dutifully based its decision on what it determined to be in the Minors' best interests given the evidence presented.

DISPOSITION

The juvenile court's February 8, 2016 order denying Mother's section 388 petition is affirmed.


IRION, J.

WE CONCUR:



McCONNELL, P. J.



BENKE, J.