Filed 2/21/24  In re Ruby C. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re RUBY C., a Person Coming Under the Juvenile Court Law. | B323925 (Los Angeles County Super. Ct. No. 22CCJP01703) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. MICHELLE C., Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Linda L. Sun, Judge.  Affirmed.

Emery El Habiby, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Melania Vartanian, Deputy County Counsel, for Plaintiff and Respondent.

* * * * * *

Michelle C. (mother) appeals jurisdictional findings and dispositional orders involving her daughter Ruby C. (born August 2007), who was 14 years old when these proceedings commenced. Mother also challenges the juvenile court's preliminary finding that the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.) and related California statutes are inapplicable. We find no error and affirm the orders of the court.

## COMBINED FACTUAL AND PROCEDURAL BACKGROUND

**The family**

Ruby lived in San Bernardino County with mother, her stepfather, and three half-siblings: Audrey (born July 2011), Solomon (born August 2013), and Gwyneth (born July 2018).[1]

Ruby's father, Patrick F. (father), resides in Glendale, California.[2] Mother had custody and father had monitored visitation.

---

[1] Audrey, Solomon, and Gwyneth have a different father. A cross-report to San Bernardino County Child Protective Services was made as to these children. They are not subjects of this appeal.

[2] Father is not a party to this appeal.

2

**Initial referral and investigation**

A social worker from the Los Angeles County Department of Children and Family Services (DCFS) responded to the Glendale Police Department on May 1, 2022. Ruby had run away from home on April 11, 2022. Mother, who discovered the child was with father in Glendale, contacted San Bernardino police, who in turn contacted Glendale police. Ruby had been with father since April 11, 2022. Father reported Ruby had called him and asked him to pick her up. She had been reported missing in the system from the previous year and was considered a habitual runaway.

When Glendale police first interviewed Ruby, she came out of father's home crying and informed police that mother is mean to her, slaps her, and curses at her. The child reported an incident in which mother was on top of her threatening to cut her hair with scissors. Ruby had small cuts on her arm and reported cutting herself the prior year. On April 7, 2022, mother removed Ruby from school to be homeschooled. When Ruby told mother this upset her, mother slapped Ruby. That night Ruby called father, and he picked her up a few houses down from her home.

Mother did not want Ruby to be with father because when she was young Ruby made comments about father sexually molesting her. Father had not seen Ruby in nine years before November 2021, when Ruby observed contact between father and mother and contacted father. Mother said father and Ruby have inappropriate contact as they discuss guns and father encourages Ruby to be disrespectful to mother. Mother reported that Ruby has a snapchat account and sends inappropriate pictures in her underwear to other juveniles. Mother told police she threw

Ruby's phone through a window because she was upset. Ruby did not want to return to mother for fear of being hit.

In an interview of Ruby by a DCFS social worker, Ruby admitted to using marijuana from May through December 2021 about three times per month, but stopped because it was not helping her. Ruby said when she was younger, if mother was missing something, mother would slap Ruby, Solomon and Audrey until one of them disclosed who took the missing item. Mother stopped doing this when Ruby was 12 or 13. The last time mother slapped Ruby was two weeks earlier, because Ruby had talked back to her. Mother spanked Solomon on the buttocks with her hand and a hanger. This happened too many times to count. Ruby also reported mother slapped Audrey in March 2022, but she did not know why. When Ruby was younger, mother would have Ruby lay on the floor and would hit her with a belt. When Ruby was seven to nine years old, mother would drag her by her hair on the floor and then lay her on her stomach and hit her with a belt on the lower back and butt area.

Ruby reported that she and mother argued a few months earlier because mother was upset that Ruby contacted father's family through social media. Mother got on top of Ruby on the bed and was threatening to cut her hair off with scissors. Mother tapped the child's face with the scissors. Mother regularly calls Ruby a "bitch" and a "slut." Two weeks earlier mother called Ruby a "bitch," "slut," "weird," and a "whore." Ruby reported mother curses at her about twice a week.

Ruby was once on a psychiatric hold for about a week because her former boyfriend told school staff that she wanted to kill herself. Ruby said she only wanted to harm herself. She denied having been hospitalized since then, her only

4

hospitalization. She was diagnosed with depression, anxiety, and PTSD. She was given medication but had stopped taking it in December 2021, when she ran away and forgot the medication. After she returned mother did not follow up with Ruby's treatment.

Ruby reported she was cutting herself with a box cutter last year. She started cutting herself in the seventh grade on her arms or upper legs twice a week for about one and a half years but stopped in October 2021. Ruby had suicidal ideations in the past. Last March or May, she took some of mother's pills in an attempt to kill herself. She felt sick and dizzy and never told anyone. About a month later Ruby took some vitamins and felt sick, but never told anyone.

Ruby had run away with father about six times. Prior to the end of 2021, she had not seen father in nine years. Mother accused father of molesting Ruby and made Ruby say this. Ruby denied that father ever molested her.

Ruby said she could not stay with mother, who hit Ruby and forced her to say things about father. Ruby recalled an incident when she was nine years old, mother slapped her over and over again. Last summer, mother hit Ruby repeatedly with a cooking spoon because mother did not think Ruby was going to watch the soup. Mother told Ruby she should go kill herself.

The social worker observed a few very superficial cuts on Ruby's left arm. There were two older scars on her upper arm, closer to her elbow, which Ruby said happened a long time ago when mother scratched her.

The social worker interviewed mother, who reported father sexually abused Ruby when she was small. DCFS investigated and believed the child. Mother went to San Bernardino family

5

court in 2015, and father received monitored visitation but did not follow through. Mother was concerned Ruby was having sex with father and questioned why the child was running away with father.

Mother confirmed Ruby was placed on a psychiatric hold from August through September 2021 because she was writing goodbye letters to her friends but then said it was a joke. Mother claimed Ruby had been receiving counseling services since she was in second grade. Ruby was diagnosed with PTSD during her psychiatric hold and was prescribed Prozac and Prazosin for her nightmares. After about one and a half months, Ruby refused to take her medication and told people that mother took her to a "crackpot" doctor. Mother wanted Ruby to be reevaluated. Mother believed Ruby has a personality disorder.

Mother denied slapping any of her children and stated that as a form of discipline she made sure they did not have electronics and did chores. Mother denied cutting Ruby's hair. She admitted to spanking the children years ago but could not remember the last time. Mother denied telling Ruby to kill herself or saying nasty things about father's family. Mother said father would tie Ruby with a rope and did not feed her.

Father, who lived in Glendale with his brother, Parker, and the paternal grandmother, Rebecca (PGM), was interviewed. Father had a trailer at the home of paternal grandfather (PGF). Father denied the sexual abuse allegations against him. When Ruby reached out to him, father and his brother Paul took her to lunch without mother's permission. Not long after, Ruby reached out to him again. Father had the child mostly in Glendale between his and his brother Paul's places.

**Prior child welfare history**

The family had an extensive prior child welfare history in San Bernardino County. Between June 2012 and April 2022, the family had 22 referrals. In December 2021, Ruby disclosed that mother hit her and her siblings with a belt and had punched and choked her in the past. Two days before, mother had climbed on top of her and threatened to cut off her hair with scissors because Ruby contacted father's family on Facebook. In September 2021, Ruby was on a psychiatric hold due to suicidal ideations and self-harm. In April 2021, Ruby disclosed that she had been sexually abused by father when she was four to five years old. In 2018, 2015, 2014 and 2013, Ruby disclosed that she had been sexually abused by father and her two uncles.

Older allegations included mother using methamphetamine in 2012 and mother and stepfather cultivating marijuana in the family's backyard.

**Dependency petition and detention hearing**

DCFS filed a dependency petition on behalf of Ruby on May 3, 2022, pursuant to Welfare and Institutions Code section 300, subdivisions (a), (b)(1), (c), and (j).[3] The petition alleged mother physically abused Ruby and her siblings (counts (a)(1)–(a)(3); (b)(1)–(b)(3)); mother engaged in medical neglect by failing to ensure Ruby took her psychotropic medication (count (b)(4)); mother was unable to provide Ruby with ongoing care and supervision due to Ruby's mental, emotional and behavioral problems (count (b)(5)); mother emotionally abused Ruby by failing to ensure she took her medication, telling the child to kill

---

[3] All further statutory references are to the Welfare and Institutions Code.

7

herself, and calling the child derogatory names (count (c)(1)); and Ruby was at risk due to mother's abuse of Ruby's siblings (counts (j)(1) and (j)(2)).

At the May 4, 2022 detention hearing, mother and father were present with counsel. Mother submitted on the issues regarding detention, and her counsel asked that DCFS be ordered to assess whether it would be appropriate for the matter to be transferred to San Bernardino County.

The court ordered Ruby detained from mother and father, who were granted monitored visitation.

After a prerelease investigation, on June 3, 2022, the court ordered the child released to the paternal uncle, Paul.

**Jurisdiction/disposition report**

A jurisdiction/disposition report was filed on June 28, 2022. Mother had been a dependent of the juvenile court when she was a minor.

On May 25, 2022, Audrey reported mother "takes" marijuana and drinks alcohol. Sometimes mother gets drunk. Audrey also reported mother and the stepfather fight a lot, including violence and suicidal statements by both mother and stepfather. Solomon denied any suicidal statements by his parents. Ruby reported mother worked at a group home and provided nicotine to the children in the home. Mother gave Ruby nicotine and threatened to get children from the group home to beat up Ruby.

A police report from San Bernardino County Sheriff's Department dated December 20, 2021, indicated when Ruby was six years old, she claimed mother choked and punched her. Recently, Ruby reported mother was upset because Ruby reached

8

out to father.  Mother got on top of Ruby with a pair of scissors and tried to cut off her hair.

In an extensive interview with Ruby on May 18, 2022, Ruby said mother's abuse got progressively worse over the years. Mother hit her on her bottom, hit her with a shoe on her face leaving a purple bruise, and slapped her after making her take a pregnancy test.  When Ruby was seven, mother hit her repeatedly until she heard Ruby's grandmother arrive. Sometimes mother would have Ruby lay on the floor and would hit her on her bottom with a belt.  Things like that happened three times per week.  The previous summer, mother got mad at Ruby because she thought Ruby was not watching the food cook. Mother began hitting Ruby with a big copper cooking spoon. When mother could not hit her, mother pinched her.  Ruby recalled an incident when mother threw her on a bed, began choking her and calling her names.  Ruby recounted mother's abuse of Audrey and Solomon as well.

Ruby also recounted emotional abuse, such as mother calling her "a bitch, useless," and telling her "to walk in the road in front of a car because I am a waste of time."  Mother also referred to Ruby as a "slut" and a "whore."  This behavior occurred for three years.

Ruby had suicidal thoughts due to mother's name-calling. Ruby took vitamins and one of her mother's prescriptions.  Ruby was being blamed for mother and stepfather's arguments.  She was told that everything was her fault.  Mother saw Ruby's arm once after Ruby cut herself, and mother grabbed Ruby's arm and tried to break it with her hands.

Ruby forgot to take her medication during winter break and did not take it for two weeks.  When she returned to mother's

home in January 2022, mother stopped giving her the pills and did not try to get Ruby back on them. Mother said she would take Ruby to a psychiatrist but never did. Ruby opined that she only needed something for her nightmares. Ruby's nightmares are mainly about mother hitting her or being chased by mother and running from her.

Ruby said she lied when she told the police her suicidal thoughts stemmed from a sexual assault at age four. Ruby did not want to tell police that the real reason was because of mother, saying, "she . . . would only get even more pissed off at me because of that. I was so depressed during that time she . . . was treating me like shit and I was feeling like shit because of her."

Ruby reported that mother "smokes weed" and takes Xanax given to her by a friend. If mother knows the children are not there, she "get[s] really fucked up on alcohol." Ruby had been told by many people that mother needed psychiatric help. Ruby claimed to have abused substances because mother had given her nicotine to smoke. Ruby admitted to using marijuana and trying heroin one time.

Ruby denied father sexually abused her, stating she did not know where such allegations came from.

Ruby disclosed she and her half siblings had "gotten used to" domestic violence between mother and stepfather, and mother was the instigator.

In an interview on May 16, 2022, mother described Ruby as "secretive and vengeful." Mother accused Ruby of pulling Audrey's hair, cutting herself, and poking holes in mother's soap bottle with a thumbtack. Mother said Ruby has had very explicit sexual conversations on Snapchat and that father told Ruby he was going to cut off her arms if she told anyone about him

sexually abusing her. Mother said father tied Ruby with rope, did not feed her, and put tape on her mouth. Mother denied both the incident with the scissors and hitting Ruby with a cooking spoon. Mother denied hitting or scratching any of her children.

Mother said Ruby was diagnosed with major depressive disorder at Loma Linda. Ruby was given Prozac and prazosin for sleep, PTSD and nightmares. Mother said Ruby was feeling dizzy with the prazosin, so mother gave her melatonin instead. Ruby did not take the Prozac because she did not like the way it made her feel. Mother claimed she tried her best to make Ruby take it. Mother admitted Ruby had tried to kill herself three or four times. She described the child as "manipulative." Mother opined that Ruby needed treatment, explaining that the child is "just dark and mean."

Mother had been a dependent of the juvenile court due to maternal grandmother (MGM) threatening suicide. At the age of 12, as a dependent of the court, mother was prescribed Zoloft. At the age of 14, mother was placed on a section 5150 psychiatric hold because she was drunk. Mother had suicidal ideations because she felt alone, and her brother was mean to her while MGM was at work. Mother admitted to a history of substance abuse before Ruby was born, having taken ecstasy in 2004 or 2005. She smoked marijuana less than 40 times and also used cocaine, but was not a chronic user of either drug. She abused cocaine, Vicodin, Norco, oxycodone, ecstasy, marijuana and alcohol with father. However, she had not used these drugs since 2015. Mother admitted to smoking marijuana in 2021 for medical care. She claimed to have been drunk five or six times since Ruby was born but not around the children.

On May 25, 2022, the social worker interviewed Audrey, who admitted witnessing mother hit Ruby two times "because she was texting her dad and sex things to other people." Audrey stated Ruby cuts herself, and mother hits Ruby with her hands and "yes she . . . did hit her with a belt, but barely . . . ." Audrey admitted mother slapped and used scissors to try to cut Ruby's hair. Audrey said mother had also done that to her, but she had done it to Ruby twice, and "Ruby was screaming so loud." After the incident, "Ruby stayed in bed crying. She (Ruby) was scared. They . . . have a bad relationship. She . . . tries to stay away from my mom. My mom did scratch her . . . . She (Ruby) was getting in trouble and as my mom walked away, she [(mother)] scratched her (Ruby's) arm, but my mom said it was an accident." Audrey disclosed that she and Ruby get hurt by mother because they are older, saying, "We get hit on the arms with her hands and it leaves a mark. Then we (she and Ruby) feel really bad like why did we do that. We should have thought about her [(mother)] first. It's normal I guess (to get hit). It's not bad (to get hit)." Audrey also disclosed that when she was five, mother "accidentally hit me across the head with a shower head, and I know I blacked out." Mother also hit her one time "because I was slacking off at school."

Solomon was also interviewed on May 25, 2022. He explained that he did not like his Halloween costume and his mom hit him, saying, "[s]he only hit me one time though, and it was because I was being rude." Solomon stated, "I don't like to remember it because I don't like to think about it. I don't know if it left [a] mark or bruise because to me it doesn't exist anymore . . . ." Solomon recounted an incident when mother threw a dustpan and hit his face, but stated that it was an

12

accident because "she wasn't looking." Solomon acknowledged fighting between the parents but said he doesn't "pay attention when they fight with each other." Solomon claimed, "I don't remember a lot of stuff because I forget a lot of stuff." He remembered mother hitting Ruby but could not remember mother hitting Audrey. Solomon appeared uncomfortable talking about the allegations.

Paternal uncle Paul and aunt Janet were also interviewed. Janet recalled Ruby saying her siblings were being beaten by mother and specifically recalled the incident when Solomon did not like his Halloween costume, and "the mom beat him badly because of it." Paul recalled being told by Ruby that mother "[got] mad at the little boy (Solomon) because he was trying to sweep and she . . . got frustrated that he wasn't sweeping good enough so she threw a dust pan at him and he has a scar on his face because of it." Ruby was "bothered . . . by how hard the mom would hit her siblings."

Ruby requested that the case remain in Los Angeles County, as she believed she would not have the same opportunities to receive and take part in services if the case was transferred to San Bernardino County. DCFS assessed it appropriate for Ruby's case to remain in Los Angeles County.

**First amended petition**

A first amended petition was filed on June 23, 2022, including allegations under section 300, subdivisions (b) and (c), concerning father's emotional abuse of Ruby. Under count b-6, the petition alleged that father has subjected Ruby to emotional abuse by having inappropriate conversations with the minor about case-related matters, causing her sadness, depression, and anxiety. The same allegation was included in count c-2. On

June 24, 2022, the juvenile court accepted the first amended petition and dismissed all prior petitions.

**Further reports**

In an addendum report dated June 24, 2022, Ruby reported father was harassing her through text messages. DCFS reported father was engaging in emotional manipulation towards the child and was shown to "bully the child, distort information," and was attempting to gain empathy and trying to make the child feel guilty. Father displayed a dismissive attitude towards the child's feelings while attempting to excuse his own behaviors. The father's actions had caused the child a great deal of emotional harm.

On August 15, 2022, a last minute information for the court was filed. Father and PGM refused contact with DCFS. Ruby remained unenrolled in school, and mother was refusing contact with the child's caretakers and to provide documents needed for Ruby's enrollment in school. Mother and Ruby disagreed on the school Ruby should attend. DCFS recommended limiting mother's educational and developmental rights over Ruby as her actions were causing further emotional distress and delaying the child's education.

Mother was enrolled in anger management classes but had been unable to schedule other classes. Mother wanted Ruby removed from her uncle and placed in a foster home, while an unresolved referral was still pending in San Bernardino County.

On August 16, 2022, the juvenile court found mother's actions caused unnecessary delay as to the child's enrollment in school and designated the caregiver, paternal uncle Paul, as co-educational rights holder.

**Facts concerning ICWA**

On May 1, 2022, mother and father were each asked about Native American background. Both denied any Native American ancestry.

Mother's and father's parental notification of Indian status (ICWA–020) forms indicated in response to questions regarding Native American ancestry, "None of the above apply."

At the May 4, 2022 detention hearing, the juvenile court noted that the parents denied Native American ancestry. The court asked the paternal uncle, Paul, who was present in the courtroom, about Indian ancestry.[4] The court inquired, "So for your mother, on your mother's side of the family, do you know whether they have any American Indian heritage?" The paternal uncle replied, "Not that I'm aware of, Your Honor."

The court found it had no reason to know that ICWA applied, and ordered DCFS to continue the inquiry by inquiring of "the mother's and father's extended family members."

On May 16, 2022, mother continued to deny any Native American ancestry.

On June 10, 2022, DCFS interviewed PGM, who stated that a DNA test showed Native American ancestry that dated back to the 1500's. She was given information that she is a direct descendant of Lady Rebecca Ann Powhatan (believed to be Pocahontas) and Lady Rebecca's father, Chief Wahunseneca Paramount Chief of the Powhatan Tribe (believed to be Pocahontas's father). DCFS was in the process of collecting the information from PGM in order to send out ICWA notices.

---

[4] Father and the paternal uncle Paul were half siblings as they shared the same mother.

In her interview for the June 28, 2022 jurisdiction/disposition report, mother reiterated she has no Native American ancestry.

On June 24, 2022, DCFS reported it was still trying to reach PGM to inquire about the family's Native American ancestry. On June 21, 2022, the social worker called PGM twice but was unable to leave a voice message due to PGM's voicemail being full. The social worker sent a text message with her telephone number, but as of the date of the report, had not received a response. Efforts would continue to contact PGM in order to obtain the information.

In a last minute information for the court filed on August 15, 2022, DCFS reported PGM continued to give no response to the dependency investigator's attempts to contact her regarding the family's Native American ancestry.

**Adjudication and disposition hearing**

The juvenile court conducted the adjudication and disposition hearing on August 23, 2022.

MGM was present in court, and the juvenile court inquired, "Do you or any family members of yours—do you know whether they are eligible for membership to any Indian tribes?" MGM replied, "No. We are Indians from Mexico, not from here."

The hearing continued, and the court admitted DCFS's exhibits into evidence and heard argument. The court sustained counts a-1, b-1, b-4, c-1 and c-2 of the section 300 petition. Counts a-1 and b-1 alleged physical abuse of Ruby by mother; count b-4 alleged medical neglect by mother; count c-1 alleged emotional abuse by mother; and count c-2 alleged emotional abuse by father.

The juvenile court found Ruby's statements regarding mother's abuse to be consistent between school counselors and law enforcement and corroborated by Audrey, whom the court found to be "very credible."

The juvenile court proceeded to disposition. Mother's counsel objected to the case plan, stating, "[m]other would submit on a parenting class and individual counseling. She would object to all other proposed terms of the case plan." Additionally, mother argued the case should be transferred to San Bernardino County as that is the residence of the mother and child.

The juvenile court ordered Ruby removed from mother and father and suitably placed. Mother was ordered to complete parenting, conjoint counseling with Ruby, anger management, and individual counseling. The parents were granted monitored visitation in a neutral setting. The court ordered DCFS to assess whether San Bernardino County was the appropriate jurisdiction for the case.

On September 26, 2022, mother filed a notice of appeal.

**Last minute information for the court**

On September 26, 2022, DCFS filed a last minute information for the court document. Mother informed DCFS that she wanted the case transferred to San Bernardino County because she thought Ruby would be moved from her current placement to a placement within San Bernardino County. DCFS thought mother's motivation was to have Ruby removed from the paternal uncle's home.

The social worker found Ruby was distressed and afraid of the prospect of having the case moved to San Bernardino County, being adamant that she would not feel safe if the case was moved to San Bernardino County because she did not feel San

17

Bernardino County CPS had fulfilled its duty to protect her in the past. Ruby said she had to run away from mother to Los Angeles County in order to find help and be protected. During previous investigations, San Bernardino CPS had refused to remove Ruby from mother, which caused Ruby to feel unsafe and frustrated. Ruby disclosed the physical and emotional abuse for years and San Bernardino CPS did not protect her.

Ruby further disclosed that mother works for group homes in San Bernardino County and "knows people," which was why Ruby was not removed from mother in the past.

DCFS reported that mental health services in San Bernardino County were more limited than those available in Los Angeles County, and Ruby's current mental health services would be interrupted if the case were transferred to San Bernardino County.

For these reasons, DCFS took the position that transferring the case to San Bernardino County would be contrary to Ruby's best interests and to the reunification process.

On September 30, 2022, the juvenile court declined to transfer the matter to San Bernardino County.

## DISCUSSION

### I. Justiciability of challenges to jurisdictional findings

We first address the parties' arguments regarding the justiciability of mother's jurisdictional challenges.

When a dependency petition alleges multiple grounds for jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or

all of the other alleged statutory grounds for jurisdiction are supported by the evidence.  (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.)  "However, we generally will exercise our discretion and reach the merits of a challenge to any jurisdictional finding when the finding (1) serves as the basis for dispositional orders that are also challenged on appeal [citation]; (2) could be prejudicial to the appellant or could potentially impact the current or future dependency proceedings [citations]; or (3) 'could have other consequences for [the appellant], beyond jurisdiction' [citation]."  (*In re Drake M.* (2012) 211 Cal.App.4th 754, 762-763, disapproved on other grounds in *In re D.P.* (2023) 14 Cal.5th 266, 283.)

Because father does not challenge the jurisdictional findings sustained concerning his behavior, even if mother succeeds in her challenges, the juvenile court will still retain jurisdiction over Ruby.  Thus, DCFS argues, this court should decline to address mother's jurisdictional challenges.

Mother argues each of the jurisdictional findings she challenges served as the basis for the juvenile court's dispositional order removing the minor from the mother's custody.  The removal order is also challenged on appeal.  In addition, mother argues the jurisdictional findings are prejudicial to mother and could potentially impact the current or future dependency proceedings or custody proceedings.

DCFS points out that mother failed to object to the removal order at the dispositional hearing.  Thus, DCFS argues, mother should not be permitted to challenge jurisdictional findings on the basis of a removal order she did not challenge in the juvenile court.  However, the record shows mother did make a general objection to all terms of the case plan with the exception of a

19

parenting class and individual counseling. We find mother's objection sufficient to challenge the removal order. Because the jurisdictional findings mother challenges led to the removal order she also challenges, we address the merits of mother's jurisdictional challenges.

## II. Jurisdictional findings

Mother challenges each of the jurisdictional findings involving her behavior: physical abuse, medical neglect, and emotional abuse.

### A. *Standard of review*

A juvenile court's jurisdictional findings are reviewed on appeal for substantial evidence. (*In re D.B.* (2020) 48 Cal.App.5th 613, 620.) "'Substantial evidence is evidence that is reasonable, credible, and of solid value.'" (*In re Christopher C.* (2010) 182 Cal.App.4th 73, 84.) The juvenile court's judgment is presumed correct, and "[a]ll conflicts are resolved in favor of the judgment and all legitimate inferences are indulged in to uphold the juvenile court's determinations." (*In re K.S.* (2016) 244 Cal.App.4th 327, 337.) "We adhere to the principle that issues of fact, weight and credibility are the provinces of the juvenile court." (*In re R.C.* (2012) 210 Cal.App.4th 930, 941.)

"'While evidence of past conduct may be probative of current conditions, the question under section 300 is whether circumstances at the time of the hearing subject the minor to the defined risk of harm.'" (*In re Ricardo L.* (2003) 109 Cal.App.4th 552, 565.) "Thus previous acts of neglect, standing alone, do not establish a substantial risk of harm; there must be some reason beyond mere speculation to believe they will reoccur." (*Ibid.*) However, remote conduct may support a finding that a minor is at risk of substantial harm under section 300. Such conduct

20

must be viewed in context.  (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1439.)  The severity of the abuse, the number of incidents of abuse, the lapse of time between instances of abuse and the filing of the dependency petition, and whether the parent has taken steps to address the issues that led to the abusive conduct all may be considered in determining whether the child remains at risk of harm.  (*Id.* at pp. 1439-1440.)

### B.   *Physical harm*

Section 300, subdivision (a) authorizes dependency jurisdiction if a child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian. Section 300, subdivision (b) authorizes dependency jurisdiction if a child has suffered, or there is a substantial risk the child will suffer, serious physical harm or illness as a result of the failure or inability of the parent to adequately supervise or protect the child.  The juvenile court sustained allegations of physical abuse by mother against Ruby under both of these provisions.

Substantial evidence supported the juvenile court's findings.  Ruby consistently alleged physical abuse by mother over the course of several years.  Ruby disclosed mother's abuse of her began when she was four years old and became worse over the years.  Mother slapped Ruby when she was upset, most recently in April 2022.  Ruby recalled that mother at times would force Ruby to lay on the floor while mother hit her bottom. Mother would hit Ruby with a belt on her lower back and buttock area.  Ruby also reported an incident when mother was on top of her, threatening to cut her hair with scissors.  Audrey's testimony substantiated Ruby's testimony regarding this incident.  Mother hit Ruby with a cooking spoon and tried to break her arm.

21

Ruby's siblings' testimony supported Ruby's allegations. Audrey reported having seen mother hit Ruby twice. Audrey also reported mother hit Ruby with a belt, slapped Ruby, and scratched Ruby. Audrey said she and Ruby were hit by mother, leaving marks. Solomon also reported abuse and recalled seeing mother hit Ruby.

Mother argues that her physical discipline of the child was protected by the reasonable parental discipline doctrine and did not constitute sufficient evidence to justify dependency jurisdiction. Mother cites *In re D.M.* (2015) 242 Cal.App.4th 634 [holding that a parent's spanking of her children on the buttocks with her bare hand and with a sandal does not categorically constitute "serious physical harm" sufficient to invoke dependency jurisdiction under § 300, subds. (a), (b), and (j)].) However, as *D.M.* instructs, whether a parent's use of discipline exceeds the scope of the parental right to discipline turns on three considerations: "(1) whether the parent's conduct is genuinely disciplinary; (2) whether the punishment is 'necess[ary]' (that is, whether the discipline was 'warranted by the circumstances'); and (3) 'whether the amount of punishment was reasonable or excessive.'" (*Id.* at p. 641.)

Mother's extensive, ongoing abuse of Ruby does not fall within the parental right to reasonable discipline. There is no evidence in the record that it was genuine discipline. Further, it was excessive and unreasonable given Ruby's purported misbehavior: talking back to mother, not watching the soup, or reaching out to father and the paternal family. Thus, there was substantial evidence the reasonable parental discipline exception did not apply.

Mother further argues that her acts of dragging and scratching the child were remote in time and unlikely to recur. We disagree. The evidence showed Ruby was afraid of mother and had run away from mother six times in order to avoid abuse. Ruby did not want to return to mother's home due to mother's physical and emotional abuse. Under the circumstances, the juvenile court was justified in finding mother's abuse of Ruby was sufficiently recent to place Ruby at current risk of serious harm.

## C. *Medical neglect*

Mother argues there is a lack of substantial evidence to support the medical neglect allegations under section 300, subdivision (b)(1). She argues she made reasonable efforts to ensure Ruby took her psychotropic medication. Mother cites to her own testimony that she tried to get the child to take the medication, but Ruby did not want to do so. Mother ignores Ruby's testimony that mother never followed up with her medications. In addition, although Ruby was exhibiting troubling behavior, the minor testified that mother told her she would take her to a psychiatrist but never did.

The juvenile court was not required to believe mother's testimony over Ruby's testimony. Issues of fact, weight and credibility are within the province of the juvenile court, and we will not disturb the juvenile court's decision to believe a child over a mother. (*In re R.C., supra*, 210 Cal.App.4th at p. 941.) Given mother's failure to ensure that Ruby received the mental health treatment she needed, the juvenile court did not err in sustaining the allegation of medical neglect.

23

**D.    *Emotional abuse***

Mother argues the juvenile court improperly sustained an allegation of emotional abuse under section 300, subdivision (c).[5] Specifically, mother argues that DCFS did not prove parental conduct, causation, and serious harm or risk of harm.

Mother points to her own testimony denying she called Ruby derogatory names.  To the extent she did call Ruby names, she argues, it was a result of Ruby's behavior and mother's frustration.  Mother insists DCFS lacked causation, as Ruby was diagnosed with serious mental health problems and father's emotional abuse was to blame.  Finally, mother argues DCFS did not prove serious emotional harm.  Ruby was diagnosed with depression, anxiety, and PTSD, but not with severe anxiety, depression, or PTSD.

Mother's arguments are not well taken in light of the competing evidence showing mother emotionally abused Ruby causing her to suffer serious emotional damage.  There was evidence Ruby suffered from nightmares, sadness, and anxiety due to mother's behavior.  Ruby testified her nightmares were about mother hitting her, about running away from mother and being chased by mother.  Ruby reported mother cursed at her, called her "a bitch, useless," and told Ruby to walk in front of a car because she is a waste of time.  Mother had called Ruby a "slut" and a "whore."  Mother forced Ruby to accuse her father of

---

[5]    Pursuant to section 300, subdivision (c), a child comes within the jurisdiction of the juvenile court if the child is suffering serious emotional damage, or is at risk of serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior towards self or others, as a result of the conduct of a parent or guardian.

24

doing sexual things to her when she was young. Ruby attempted suicide on two occasions because of mother. She also cut herself because of mother, disclosing, "I'd cut myself after an argument with my mom because I would use it as a form of punishment on myself." Ruby ran away from home approximately six times because of mother, who does not dispute that Ruby's acts were caused by mother's behavior.

The evidence from Ruby supported the juvenile court's determination that mother's conduct caused Ruby severe emotional upset, resulting in a serious risk of harm to the minor.

## III. Dispositional orders

### A. *Applicable law and standard of review*

A juvenile court "may direct any reasonable orders to the parents or guardians of the child who is the subject of any [dependency] proceedings . . . as the court deems necessary and proper to carry out this section." (§ 362, subd. (d).) Such order "may include a direction to participate in a counseling or education program." (*Ibid.*) "The program in which a parent or guardian is required to participate shall be designed to eliminate those conditions that led to the court's finding that the child is a person described by Section 300." (*Ibid.*)

The juvenile court has broad discretion to determine what would serve a child's interest and issue dispositional orders accordingly. (*In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1006.) A reviewing court will not disturb a discretionary order unless it was arbitrary, capricious, or patently absurd. (*In re Raymundo B.* (1988) 203 Cal.App.3d 1447, 1456.)

### B. *Dispositional orders*

Mother challenges the juvenile court's dispositional orders removing the minor from mother's custody, ordering mother to

25

participate in anger management, parenting, and individual counseling, and restricting mother to monitored visits with the minor.  Because mother specifically stipulated to parenting and individual counseling below, we decline to discuss mother's objections to these dispositional orders and consider those arguments forfeited.  As set forth below, we reject mother's remaining objections to the dispositional orders.

>    **1.**    *Removal order*

A juvenile court may not remove a minor from the custody of his or her parent unless the court finds by clear and convincing evidence that there would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the child, and there are no reasonable means by which the child can be protected without removal from the parent's custody. (§ 361, subd. (c)(1).)

Mother argues the juvenile court's order removing Ruby from her custody was improper because it was not supported by substantial evidence.  Mother argues her acts of physical abuse of the child were protected by the reasonable parental discipline standard and reasonable alternatives to removal existed.

We review the juvenile court's removal order for substantial evidence, keeping in mind the juvenile court was obligated to find clear and convincing evidence supporting removal.  In cases such as this, "'the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true.'" (*In re V.L.* (2020) 54 Cal.App.5th 147, 155.)  In making this assessment, we view the record in the light most favorable to the prevailing party below and give deference to the fact finder's evaluations of credibility,

resolution of conflicting evidence, and reasonable inferences. (*Ibid.*)

Bearing the heightened standard in mind, we find that substantial evidence supports the juvenile court's order removing Ruby from mother's custody. As set forth in detail above, mother physically and emotionally abused Ruby and medically neglected her. Considering such evidence, the juvenile court did not err in determining Ruby's physical and emotional health would be at risk if Ruby remained in mother's custody. Further, mother provided no evidence that alternatives to removal were acceptable. Mother declined to accept responsibility for her actions. She denied physically harming Ruby and denied telling Ruby to kill herself. Instead, she blamed the child, stating that Ruby was "secretive and vengeful" and describing the child as "manipulative," "dark and mean." Mother's refusal to take responsibility for her actions shows Ruby to be at continued risk from mother's abuse. This continued risk to Ruby supports the juvenile court's determination alternatives to removal were not reasonable under the circumstances.

**2.** *Anger management*

As mother has forfeited her challenges to the juvenile court's dispositional orders requiring parenting classes and individual counseling, we address only mother's challenge to the requirement that she attend anger management. Mother argues she does not need to attend anger management. Mother argues her frustration at Ruby's behavior was caused by Ruby, who did things like send nude photographs of herself to other minors, had sex at a young age, and experimented with drugs. Mother argues her acts of physical discipline and calling the child names were a result of Ruby's actions and were thus justified.

The juvenile court has broad discretion to order parental programs that will serve a child's best interest. (*In re Christopher H., supra*, 50 Cal.App.4th at p. 1006.) Dispositional orders should be designed to address potential obstacles to reunification. (*Ibid.*) We will not disturb a juvenile court's dispositional orders unless the court has abused its discretion. (*In re Raymundo B., supra*, 203 Cal.App.3d at p. 1456.)

The juvenile court did not abuse its discretion in ordering mother to complete an anger management program. The juvenile court found credible the allegations that mother physically abused Ruby, called her names, and encouraged her to kill herself. Mother's extreme reactions to Ruby's behaviors warranted an anger management program, and it was within the juvenile court's broad discretion to order one.

### 3.    *Monitored visitation*

Mother argues that the juvenile court abused its discretion in restricting her to monitored visits with Ruby, arguing that monitored visits were not in the best interest of the minor, as unmonitored visits were necessary to rebuild the bond between mother and Ruby. Mother cites section 362.1, subdivision (a)(1)(A), which provides that "[v]isitation shall be as frequent as possible, consistent with the well-being of the child." A juvenile court's order restricting visitation between a parent and child will not be disturbed on appeal absent an abuse of discretion. (*In re D.P.* (2020) 44 Cal.App.5th 1058, 1070.)

The juvenile court's determination that mother should have monitored visits with Ruby was well within the juvenile court's discretion given the circumstances of this case. Ruby attempted suicide and had nightmares, sadness, and anxiety because of mother's behaviors. Mother failed to understand the minor's

28

health needs and failed to provide her with necessary mental health treatment. Mother lashed out at the child with physical and verbal abuse. Throughout much of the pendency of the proceedings up until the jurisdiction/disposition hearing, Ruby was unwilling to visit with mother at all. The juvenile court did not err in determining that it was in Ruby's best interest to have monitored visits with mother.

## IV.   ICWA

Mother asserts the juvenile court failed to conduct an adequate inquiry into Ruby's possible American Indian heritage by failing to interview extended family members such as the paternal uncle, PGF and maternal grandfather about such possible heritage. Mother asks that we order a limited reversal of the jurisdictional findings and dispositional orders for DCFS to conduct a sufficient inquiry and investigation.

### A.   *Applicable law and standard of review*

ICWA and related California statutes reflect the Legislature's intent "to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families." (25 U.S.C. § 1902; see *In re K.R.* (2018) 20 Cal.App.5th 701, 706, fn. 3.) An "Indian child" is defined as any unmarried person under the age of 18 who is either a member of an Indian tribe or is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe. (25 U.S.C. § 1903(4); Welf. & Inst. Code, § 224.1, subds. (a), (b).)

"Because it typically is not self-evident whether a child is an Indian child, both federal and state law mandate certain inquiries to be made in each case. These requirements are

sometimes collectively referred to as the duty of initial inquiry." (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 741 (*Benjamin M.*).) "The duty to inquire begins with the initial contact, including, but not limited to, asking the party reporting child abuse or neglect whether the party has any information that the child may be an Indian child." (§ 224.2, subd. (a).) The court and child welfare department "have an affirmative and continuing duty" to inquire whether a child for whom a petition under section 300 may be or has been filed may be an Indian child. (§ 224.2, subd. (a).)

Under California law, the child welfare department's initial duty of inquiry includes, but is not limited to, "asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled." (§ 224.2, subd. (b).) Under ICWA, the term "extended family member" is "defined by the law or custom of the Indian child's tribe or, in the absence of such law or custom, shall be a person who has reached the age of eighteen and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent." (25 U.S.C. § 1903(2).)

The juvenile court must also inquire at each participant's first appearance in court whether the participant knows or has reason to know that the child is an Indian child. (§ 224.2, subd. (c).) In addition, the juvenile court must instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child. (§ 224.2, subd. (c).)

If the "initial inquiry creates a 'reason to *believe*' the child is an Indian child, then the Agency 'shall make *further inquiry* regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable.' ([§ 224.2], subd. (e), italics added.) [I]f that further inquiry results in a reason to know the child is an Indian child, then the formal notice requirements of section 224.3 apply. (See § 224.2, subd. (c) [court is obligated to inquire at the first appearance whether anyone 'knows or has reason to know that the child is an Indian child']; *id.*, subd. (d) [defining circumstances that establish a 'reason to know' a child is an Indian child]; § 224.3 [ICWA notice is required if there is a 'reason to know' a child is an Indian child as defined under § 224.2, subd. (d)].)" (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1052.)

We review a juvenile court's ICWA findings under the substantial evidence test, "'which requires us to determine if reasonable, credible evidence of solid value supports' the court's ICWA finding." (*In re Dezi C.* (2022) 79 Cal.App.5th 769, 777, review granted Sept. 21, 2022, S275578 (*Dezi C.*).) Even if substantial evidence does not support the juvenile court's ICWA findings, we may not reverse unless we find that error was prejudicial. (Cal. Const., art. VI, § 13; *Benjamin M., supra*, 70 Cal.App.5th at p. 742.)

At this time, California appellate courts have taken varying positions on the rules for assessing whether a defective initial inquiry is harmless. The varying approaches have led to "a continuum of tests for prejudice stemming from error in following California statutes implementing ICWA." (*In re A.C.* (2022) 75 Cal.App.5th 1009, 1011; see *Dezi C., supra*, 79 Cal.App.5th at pp. 777-778, review granted.) Our division has adopted the

following rule: "[A]n agency's failure to conduct a proper initial inquiry into a dependent child's American Indian heritage is harmless unless the record contains information suggesting a reason to believe that the child may be an 'Indian child' within the meaning of ICWA, such that the absence of further inquiry was prejudicial to the juvenile court's ICWA finding. For this purpose, the 'record' includes both the record of proceedings in the juvenile court and any proffer the appealing parent makes on appeal." (*Dezi C.*, at p. 779.)[6]

### B. *Mother has failed to show reversible error*

Mother argues that DCFS breached its duty of inquiry by failing to interview extended family members such as paternal uncle, PGF, and maternal grandfather regarding Ruby's possible Indian heritage. Mother requests we impose the "automatic reversal rule" set forth in *In re Y.W.* (2021) 70 Cal.App.5th 542, 554 (mother's denial of Indian ancestry at the outset of dependency proceedings did not end the department's duty of inquiry, especially where relevant contact and identifying information was readily available). By failing to interview extended family members pursuant to section 224.2, subdivision (b), mother argues, DCFS failed to conduct an adequate inquiry as to the minor's possible Indian ancestry.

---

[6] The California Supreme Court granted review of *Dezi C.* on September 21, 2022, S275578. In its opinion granting review, the Supreme Court has stated that pending review, *Dezi C.* "may be cited, not only for its persuasive value, but also for the limited purpose of establishing the existence of a conflict in authority that would in turn allow trial courts to exercise discretion under *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 456, to choose between sides of any such conflict." (*In re Dezi C.*, S275578, Supreme Ct. Mins., Sept. 21, 2022, p. 1155.)

We disagree. Both mother and father denied Indian ancestry to the juvenile court. The court interviewed paternal uncle about Indian ancestry at the detention hearing, which he denied. MGM denied Indian heritage, and mother reported she did not know her father's identity.[7]

As to the paternal grandparents, PGM reported they had Native American ancestry dating back to the 1500's. PGM was given information she was a direct descendant of Lady Rebecca Ann Powhatan (believed to be Pocahontas) and her father, Chief Wahunseneca Paramount Chief of the Powhatan Tribe. DCFS reported it was attempting to collect information from PGM in order to send out ICWA notices, and once the ICWA notices were complete, the information would be provided to the juvenile court. Thus, the investigation as to the paternal family remained ongoing. DCFS had twice reported that its efforts to follow up with PGM were fruitless, as PGM failed to respond to repeated inquiries. ICWA does not require DCFS or the court to obtain information from relatives who refuse to talk to DCFS. (*In re A.M.* (2020) 47 Cal.App.5th 303, 323.)[8]

---

[7] There is no evidence that any maternal relative had contact information for mother's unknown father. DCFS was not required "to conduct an extensive independent investigation for information." (*In re C.Y.* (2012) 208 Cal.App.4th 34, 40.) "Without reliable contact information, DCFS could not reasonably have been expected to interview" mother's paternal relatives. (*In re Q.M.* (2022) 79 Cal.App.5th 1068, 1083.)

[8] In addition, Ruby was placed with a paternal uncle, a preferred placement under ICWA if there was Indian ancestry in the paternal family. (See *In re J.W.* (2022) 81 Cal.App.5th 384, 390-391 [finding inquiry error harmless because child was placed with grandparent and under the *Dezi C.* standard].)

This appeal is from the jurisdictional and dispositional phase; therefore the matter is ongoing. DCFS and the juvenile court have an ongoing duty to comply with ICWA and related California law throughout the pendency of these proceedings. Although the juvenile court made an initial finding ICWA does not apply in this case, it retains the power and duty to subsequently change that finding if new information gives the court reason to believe that the subject children are Indian children. (*In re S.H.* (2022) 82 Cal.App.5th 166, 176.) "[A]n ICWA appeal at the jurisdiction and disposition stage" is premature "where there will necessarily be further dependency proceedings in the juvenile court (at which continuing ICWA duties apply) and a basis for later appeal if for some reason the remedial ICWA investigation [DCFS] is now undertaking falls short." (*In re Baby Girl M.* (2022) 83 Cal.App.5th 635, 638.)

Based on the evidence provided thus far in the proceedings, the juvenile court did not err in making its preliminary determination that ICWA was inapplicable. DCFS reports adequately documented its inquiry of Indian ancestry, and the juvenile court provided necessary oversight. Because the record before us makes clear the ICWA investigation was ongoing below, should it become known, or should there be reason to know, that the child is an Indian child, the notice requirement will be activated, and the relevant tribes will need to be notified. The jurisdictional and dispositional findings regarding mother need not be reversed in order to direct the juvenile court and DCFS "to do something they recognize they must do anyway." (*In re S.H., supra*, 82 Cal.App.5th at p. 177.)

34

## V.     Transfer to San Bernardino County

Finally, mother argues the juvenile court erred in declining to transfer the case to San Bernardino County. Mother argues it was in Ruby's best interest to transfer the matter as mother requests.

Section 375 provides that a juvenile court "may" transfer a case to the county where the child's previously custodial parent resides. (§ 375, subd. (a).) The statute does not require the court to do so. California Rules of Court, rule 5.610(c), also permits, but does not require, the juvenile court to transfer the case to the juvenile court of the child's residence. The juvenile court must consider the best interest of the minor when it decides whether to transfer a case. (*In re J.C.* (2002) 104 Cal.App.4th 984, 992.) We review the court's decision for abuse of discretion. (*Id.* at p. 993.)

The juvenile court did not abuse its discretion in declining mother's request to transfer the matter to San Bernardino County. The social worker's conversations with Ruby show the child was distressed, frustrated, and afraid at the prospect of the case being transferred. She felt she would not be safe in the hands of San Bernardino County CPS because the agency had not fulfilled its obligation to protect her in the past. Ruby's emotional state was fragile. She had a history of suicidal ideation. DCFS was concerned that transferring the case would potentially cause Ruby to relapse into unsafe thoughts and behaviors. DCFS also reported that mental health services in San Bernardino County were more limited than those available in Los Angeles County, and Ruby's current mental health services would be interrupted if the matter were transferred to San Bernardino County.

Further, mother's interest in having the matter transferred to San Bernardino County appeared to be rooted in mother's desire to have Ruby removed from the care of the paternal uncle. During the interview, mother stated she wanted Ruby removed from paternal uncle's home and moved to a foster home. She stated she wanted the case transferred because she assumed if the case was transferred, Ruby would be moved to another placement in San Bernardino County.

Based on the above-described evidence, the juvenile court did not abuse its discretion in determining Ruby's best interests were served by keeping the matter in Los Angeles County and declining to transfer it to San Bernardino County.

## DISPOSITION

The findings and orders are affirmed.

 

_____
CHAVEZ, J.

We concur:

_____
ASHMANN-GERST, Acting P. J.

_____
HOFFSTADT, J.