Filed 10/21/25  In re Alex A. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Alex A., et. al., Persons Coming Under the Juvenile Court Law. | B341553 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 24CCJP02216A-D) |
| Plaintiff and Respondent, | |
| v. | |
| A.A., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Debra Losnick, Judge.  Affirmed.

David M. Yorton, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Jane Kwon, Principal Deputy County Counsel for Plaintiff and Respondent.

———————————

Father challenges the juvenile court's jurisdictional findings and dispositional orders as to his four children. Father argues that the juvenile court's jurisdictional findings based on his drug use and domestic violence were not supported by substantial evidence. He contends the juvenile court abused its discretion by ordering him to undergo weekly drug testing and a full drug program with individual therapy as part of its dispositional orders. Father also challenges the removal of the children from his care. We affirm on all grounds.

## FACTUAL AND PROCEDURAL BACKGROUND

The parents began dating in 2010 and had their first child in 2012. The family consists of mother, father, and their four children: Alex (born in March 2012), Anajulia (born in May 2014), Antonio (born in November 2022), and Estella (born in March 2024). The family has child welfare history from 2023, which we discuss below. At the time of the present dependency proceedings, father had recently moved out of the family home and the maternal grandparents shared a two-bedroom apartment with mother and the four children.

## I.     Child Welfare History

In November 2023, the Los Angeles County Department of Children and Family Services (DCFS) received a referral alleging

2

that in the presence of their children,[1] the parents argued, mother poured jugs of milk on father, and father hit mother five to six times in the face with a closed fist. Father was arrested for domestic violence as police determined he was the dominant aggressor. DCFS investigated and the two older children confirmed these events, except the children indicated father pushed, not punched, mother. The parents verified the children's account. They declined to pursue a restraining order or family law order, and father continued visiting the children in mother's home with no issues.

During the investigation, father reported smoking marijuana weekly for sleep. In December 2023, father had one no-show for drug testing and one positive drug test for marijuana. DCFS referred mother for services and closed the investigation, finding no risk of harm to the children.

## II.     DCFS's Present Investigation

On July 6, 2024, mother called father, who had recently moved out of the family home, and threatened to hang herself, showing father a rope via FaceTime. The younger children, an infant and toddler, were at home with mother during her suicide threat. When police arrived, mother admitted to having several prior suicide attempts and having postpartum depression. Police placed mother on an involuntary psychiatric hold and left the children in father's custody

Three days later, on July 9, 2024, mother called the police, claiming that burglars were in her home. Police responded and found mother in the midst of a panic attack, pacing in the kitchen with a knife in hand and breathing heavily. The infant and

---

[1]     Estella was not yet born.

toddler were again home with mother.  Mother said she was stressed and overwhelmed because father had not been helping her with the children.  Mother's legs were covered in flea bites, she had not bathed in several days, and the home was filthy.  Police placed mother on another psychiatric hold due to her paranoia and delusions.

DCFS received referrals for these events and investigated on July 10, 2024.  DCFS inspected the family's apartment, finding all four children with mother.  Mother told the DCFS social worker that she was overwhelmed, anxious, and stressed because father did not help her with their children.  Mother confirmed that the two younger children were in the home and asleep during the knife incident.  When she was discharged from the hospital, mother picked up the children from father. Mother informed DCFS that father was changing his work schedule so he could have the children from noon to 4:00 p.m. to give her assistance.  She said father also needed services, but had no concerns about the children being with father.

Mother confirmed that they had engaged in domestic violence in November 2023 (the milk incident).  Mother denied that father pushed her; she said he threw tissue at her and she fell.  She and father separated shortly after father's arrest.

When speaking with the social worker, father denied the children were present for mother's second mental health incident involving the knife.  He stated he was unaware of mother's postpartum mental health issues at the time but explained that he had since adjusted his work schedule to provide her additional support.  Father admitted to using marijuana but denied any other substance use.  He also denied any history of domestic violence with mother, stating there had been a "small incident,"

which he characterized as isolated. He stated they were no longer in a relationship.

The eldest child, Alex (then twelve years old), confirmed the two younger children were with mother during her July 6 suicide threat. When police were at their home, he and his siblings went to a paternal relative's home. However, all four children returned to mother's care within two days. Alex denied ever seeing the parents use drugs or alcohol, and denied witnessing domestic violence between the parents. Alex was not afraid of either parent, but was concerned about mother.

Then-ten-year-old Anajulia stated she was in the car with father on July 6 and heard mother threaten suicide over the phone. Ever since, Anajulia had a stomachache and difficulty eating. Anajulia reported that father drank "one drink once a week," which he got from the liquor store. Father was not aggressive or incoherent after drinking; instead, he would just sleep. Anajulia denied seeing domestic violence between the parents.

The maternal grandmother stated she had no concerns regarding mother's mental health or the children's wellbeing. However, she expressed concern about father, stating that he was very aggressive. The maternal grandmother wanted mother to have protection from him. Father called mother a derogatory name and frequently cursed at her. The maternal grandmother believed father, who frequently threatened to take the children away from mother, caused mother's anxiety and stress. The maternal grandmother disliked and feared father due to his treatment of mother. She said father had broken into her home and went into mother's room, damaging doors and making a mess.

## III. Petition and Detention

On July 15, 2024, the juvenile court authorized DCFS to detain the children from the parents. The two older siblings, Alex and Anajulia, were placed with paternal relatives. The younger two, Antonio and Estella, were placed with a foster parent.

On July 17, 2024, DCFS filed a Welfare and Institutions Code[2] section 300 petition alleging Alex, Anajulia, Antonio, and Estella were at serious risk of harm due to mother's mental and emotional problems and father's failure to protect them from such problems. On July 18, 2024, the parents entered denial pleas and father was deemed the presumed father of the children. The court detained the children from mother, and over DCFS's objections, released them to father on the condition that he reside with a paternal relative. The court ordered monitored visits for mother and that father was not to monitor mother's visits.

## IV. Further Investigation

In July, August, and September 2024, DCFS continued to investigate and discovered the following.

***Mother's Mental Health Issues.*** Alex told DCFS that mother would send the children to father " 'and hurt herself.' " One time, mother tried to take a lot of pills when father and the children were present. Father slapped the pills out of mother's hand and then monitored mother so that she did not try to hurt herself. The incident gave Alex anxiety. Out of fear, Alex would stay with mother to prevent her from harming herself. Anajulia stated that mother was hospitalized twice for wanting to strangle

---

[2] All undesignated statutory references are to the Welfare and Institutions Code.

6

herself. Anajulia told father she did not want to stay with mother because she was scared mother would hurt them.

Father admitted that after mother's suicide threat involving the rope, the police officer told father he could not leave the children with mother. Despite this, father left the children in mother's care because her nineteen-year-old niece was present in the home. Father also confirmed that the two younger children were with mother during her paranoid episode involving a knife. Following the knife incident, father took the children from mother's home, but he returned the children to mother's care days later.

Mother also confirmed that the children returned to her care after both psychiatric hospitalizations. Mother stated, " 'I did tell [father] that maybe [the children] shouldn't be with me because I'm under the effects of medication. But he said he had to go to work.' " When mother told father she needed help, he responded she had the maternal grandmother. Mother also said father would " 'verbally bring me down.' "

***Parental Drug Use.*** In 2016, father was arrested for possession of marijuana and had to register as a controlled substance offender. When asked about his 2016 arrest for possession, father said, " 'It was for personal use.' " He stated he had to register as a Controlled Substance Offender after being arrested for possession of marijuana, but his case was "thrown out" when "a Proposition passed."

In July 2024, father tested positive for marijuana and cocaine. When asked about his July 19, 2024, positive cocaine test result, father explained that the day before the drug test, he smoked a joint, which, unbeknownst to him, was laced with

cocaine.  Father denied a history of cocaine use and denied using any other drugs.

In August and September 2024, father had five positive drug tests for marijuana; he never tested negative.  Father nonetheless denied having a history of substance abuse.  He stated in mid-August 2024, " 'They have on record that I smoke weed, but I stopped.' "  However, the next day, father tested positive for marijuana with a high concentration of the drug (1500 ng/mL).[3]  In September 2024, father told DCFS that he was trying to stop using marijuana, but he had "been smoking for years, so going cold turkey is hard.  I'm trying to do the right thing."  Several days later, father tested positive for marijuana, again at a high concentration (1480 ng/mL).

Mother stated she did not know if father used marijuana and explained that father had used cocaine years ago, but was not presently using cocaine.  Mother confirmed father became a Registered Controlled Substance Offender in 2016.

Alex told DCFS that he had not seen father use marijuana. However, Anajulia said mother and father " 'used to' " use drugs. She reported that she and Alex had found " 'a bag that had a plant on it' " filled with white circular pills in the medicine cabinet.  Anajulia said that on a phone she shared with mother, she saw text messages between the parents indicating that father had stopped doing drugs " 'a while back but my mom didn't want to.' "  Anajulia stated that father's eyes were " 'red most of the time.' "

---

[3]     Father's other positive marijuana tests reflected smaller concentrations of the drug at values of 600, 427, 1112, 426, and 671 ng/mL.

The paternal aunt reported that the parents smoke marijuana but not in the children's presence. She denied that father used any other drugs.

In August 2024, mother tested positive for marijuana, and in September, she tested positive for methamphetamine and amphetamine.

***Mother Supplied Alex with THC Vape Pens.*** Father informed DCFS that mother was providing Alex with vape pens containing THC. Father learned about the vaping when he read text messages between Alex and mother, but denied knowing anything else about it.

When interviewed about the vape pens, Alex told DCFS that he had tried a THC vape pen with his cousins in December 2023 and then with a girl at school. When Alex told mother that he had tried vaping, mother was not upset with him and instead she began sharing THC vape pens with Alex, who at the time was 11 and 12 years old. Alex reported that mother had supplied him approximately 15 THC vape pens over an eight- or nine-month period. Alex stated that father was upset mother was supplying him with vape pens but he did not know whether or not father addressed the issue with mother.

***Domestic Violence.*** Father and mother had been together for 14 years, but due to relationship problems, father had recently moved out of the family home. Mother's mental health incidents happened about two months after he left the home. Father denied the existence of domestic violence in their relationship, with the exception of the 2023 milk incident.

At times, mother felt concerned about the children in father's care " 'because he's short-tempered sometimes.' " Although the children had not complained recently, they had

previously called her and said, " 'Dad's mad.' " Mother denied domestic violence in their relationship but indicated there was a lot of verbal abuse. Mother said their relationship was rough, but they were trying to co-parent.

Anajulia told the social worker that she did not always feel safe in the home with father and the paternal relatives. Although father did not yell at them or physically discipline them when angry, Anajulia stated that father's face was angry and he had " 'angriness every day.' "

In August 2024, father enrolled in a Nurturing Fathers/Thriving Dads program and completed three of 20 Anger Management classes. Father was then dropped from the program " 'due to childcare challenges' " and scheduled to restart a 12-week parenting course at the end of August.

***Violations of the Visitation Order and Additional Domestic Violence.*** Mother told DCFS that on August 21, 2024, she attended Alex's soccer game, where father was also present with three of the children. Because she did not want to carry her purse with her, mother stored it in father's car. Alex forgot his cleats at home so father left with Estella to get Alex's cleats. Alex went onto the soccer field with his team and mother was left alone with Antonio in violation of the juvenile court's July 2024 order that mother's visits be monitored.

When father and Estella returned, father became upset after discovering messages from other men on mother's phone, which she had left in her purse inside his car. He stated to mother, " 'If you want to work things out with me, then you need to unlock your phone and let me read all of your messages.' " When mother unlocked her phone, father saw messages and photos she had sent to her male friends. Upset, father threw and

broke the phone in Antonio's and Estella's presence. Father confirmed that he broke mother's phone but asserted the children were not present.

Subsequently, father sent mother threatening text messages. Father texted, "[W]atch what you say," "Speak up watch how I show the cocaine shit and your drug test from blue star," "Try me in court," and "Yup fuck wit me."

It also came to DCFS's attention that father was leaving the children at maternal grandmother's home where mother resided, without a proper monitor for mother's visitation.

***Unexplained Injury to Antonio.*** In early September 2024, during mother's monitored visitation, a social worker observed that one-year-old Antonio had a two- to three-inch white patch on his right arm that appeared to be a burn. When asked about it, mother and the maternal grandmother said they had first noticed the injury on August 20, 2024, and had taken a photo of it that day. The August 20 photo showed the wound already beginning to scab.

Father later told the social worker that Antonio had burned his arm just one week earlier, which was inconsistent with the photograph produced by the maternal grandmother showing the injury two weeks earlier. Father explained that it was hot outside and the child had brushed against something metal in the backyard. However, when the social worker interviewed the paternal aunt, she said father had told her he did not know how the injury occurred because Antonio never cried or complained. She stated that father repeated his lack of knowledge even when she asked him where he had been when it happened.

## V.    Amended Petitions

In August and September 2024, DCFS amended the section 300 petition three times to include allegations that the children were placed at risk of serious harm from:  (1) father's substance abuse, (2) the parents' domestic violence in the children's presence with father as the dominant aggressor, (3) mother providing Alex with marijuana, and (4) mother's mental and emotional problems and father's failure to protect the children from such problems.

Also in September 2024, the juvenile court detained the children from parental custody, and ordered monitored visitation for the parents.

## VI.   Jurisdiction and Disposition Hearing

On October 10, 2024, the juvenile court held the combined jurisdiction and disposition hearing and received into evidence DCFS's reports and an August 2024 letter indicating father participated in three of 20 anger management classes.

DCFS asked the court to sustain the petition as pled. Counsel for the children joined in DCFS's request, citing "concerns for the well-being of the children" and expressing alarm that additional problematic behavior had surfaced during the dependency case.  Counsel emphasized mother's undisputed mental health issues, the parents' volatile relationship, mother furnishing the eldest child with a vape pen, and the parents' repeated violations of the court's visitation order.  Counsel also pointed out that the toddler and baby were "very young and unable to protect themselves."

Mother's counsel argued there was no present risk of harm to the children because mother acknowledged it was wrong to give the vape pen to Alex and she now has insight not to do it

12

again, the parents were no longer in a relationship and thus domestic violence would not recur, mother was not currently using substances, and mother had not had any other mental health episodes since her hospitalization.  Father's counsel urged the court to dismiss his substance abuse count because there was no nexus between father's marijuana use and his ability to provide the children regular care.  Counsel argued the court should amend the domestic violence count, asserting the allegation did not properly reflect his role in those conflicts.  Counsel argued father acted in self-defense during the milk incident and that throwing mother's phone in proximity to the children was an inappropriate act of frustration.  Father submitted on the allegation that he failed to protect the children from the dangers posed by mother's mental health issues.

In rebuttal, DCFS pointed out that father not only tested positive for marijuana, but also for cocaine.

After hearing argument, the juvenile court sustained the counts alleging that mother supplied Alex with a vape pen and that mother's mental and emotional problems placed the children at substantial risk of harm, from which father failed to protect the children.  As pertinent to this appeal, the court also sustained the following counts as pled:

"(a-1) . . . [Mother and father] have a history of engaging in violent altercations in the presence of the children.  On or about 11/25/2023, when the mother was pregnant with Estella, the mother poured milk on the father and the father pushed the mother, causing her to fall, in the presence of the children.  On or about 8/21/2024, the father became upset with the mother and threw and broke her phone in the presence of the children. . . .  The violent conduct by the father against the mother, and the

13

mother's failure to protect the children, endangers the children's physical health and safety, creates a detrimental home environment, and places the children at risk of physical harm, damage, danger and failure to protect."

"(b-3) . . . [Father] has a history of substance abuse, including marijuana and cocaine, and is a current abuser of marijuana and cocaine, which renders the father incapable of providing regular care and supervision of the children. On 7/19/2024, the father had a positive toxicology screen for cocaine. On 12/19/2023, 7/17/2024, 8/15/2024, 8/22/2024, and 8/26/2024, the father had positive toxicology screens for marijuana while the children were in his care. Further, the father is a Registered Controlled Substance Offender. The children, Antonio and Estella are of such a young age requiring constant care and supervision and the father's substance abuse interferes with providing regular care and supervision of the children. . . . The father's substance abuse and the mother's failure to protect the children endangers the children's physical health and safety, creates a detrimental home environment, and places the children at risk of serious physical harm, damage, danger, and failure to protect."

For disposition, the juvenile court ordered the children removed from parental custody, and ordered family reunification services for the parents with monitored visits. The court highlighted that neither parent followed the court's orders and father continued to drug test positive after the court released the children to him.

Regarding father's case plan, father's counsel agreed to individual counseling and parenting, but did not believe a full drug program was necessary because his positive drug tests for

marijuana were for similar quantities throughout the case. Counsel proposed father undergo weekly testing and only enroll in a full program if he tested positive for another substance. Counsel also stated that father had already attended six anger management classes.

Over father's counsel's objections, the court ordered father to participate in a full substance abuse treatment program with aftercare, weekly random and on-demand drug/alcohol testing, and a 12-step program, as well as a parenting program and individual counseling with a licensed therapist to address case issues, including substance abuse, domestic violence, and anger management.

Father appealed.

## VII. The Children Returned to Father's Custody

While this appeal was pending, on April 10, 2025, the juvenile court ordered the children released to father's custody, on the condition that he reside with the paternal aunt or in another DCFS-approved housing arrangement, and abide by all court orders.

## DISCUSSION

Father argues that substantial evidence did not support the juvenile court's jurisdictional findings under count (a-1) regarding the parents' domestic violence and count (b-3), dealing with father's substance abuse. He also contends the court abused its discretion by ordering father to submit to drug and alcohol testing and participate in a substance abuse program, 12-step program, and therapy. Father further challenges the removal of the children from his custody.

15

## I.    Substantial Evidence Supported Jurisdiction

### a.    *Father's Challenge to the Substance Abuse Finding is Not Moot*

Father argues that substantial evidence did not support two of the five bases for jurisdiction. "When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence." (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.) However, as father points out, in *In re D.P.* (2023) 14 Cal.5th 266, 283 (*D.P.*), the Supreme Court clarified that "where a jurisdictional finding 'serves as the basis for dispositional orders that are also challenged on appeal' [citation], the appeal is not moot."

Here, father challenges the jurisdictional findings under count (a-1), alleging domestic violence between the parents, and count (b-3), alleging father's substance abuse. He contests only the dispositional orders requiring him to participate in drug testing and substance abuse treatment. Accordingly, we address the challenge to count (b-3), which directly supports the disputed dispositional orders, and decline to reach count (a-1), which does not relate to the challenged dispositional orders.

### b.    *Applicable Law*

The juvenile court may exercise jurisdiction over a child if DCFS establishes by a preponderance of the evidence that the allegations made pursuant to section 300 are true. (*In re I.J.*

(2013) 56 Cal.4th 766, 773.)  Section 300, subdivision (b)(1)
provides that a child is within the juvenile court's jurisdiction if,
"[t]he child has suffered, or there is a substantial risk that the
child will suffer, serious physical harm or illness, as a result of
. . .  [¶]  (A) [t]he failure or inability of the child's parent or
guardian to adequately supervise or protect the child" or "(D)
[t]he inability of the parent or guardian to provide regular care
for the child due to the parent's or guardian's . . . substance
abuse."

"Thus, to obtain a jurisdictional determination under
section 300, subdivision (b)(1), [DCFS] must 'prove three
elements:  (1) the parent's or guardian's neglectful conduct or
failure or inability to protect the child; (2) causation; and (3)
serious physical harm or illness or a substantial risk of serious
physical harm or illness.' " (*In re S.F.* (2023) 91 Cal.App.5th 696,
712.)  "For jurisdiction under section 300, subdivision (b)(1)(D),
the child protective agency must prove that substance abuse
makes the parent or guardian unable to provide regular care for a
child and that this inability caused the child to suffer serious
physical harm or illness or creates a substantial risk of such
harm or illness."  (*In re Gilberto G.* (2024) 105 Cal.App.5th 52,
62.)

" 'A parent's " '[p]ast conduct may be probative of current
conditions' if there is reason to believe that the conduct will
continue." ' " (*In re J.A.* (2020) 47 Cal.App.5th 1036, 1048.)  In
addition, "a child's youth and maturity level can bear upon the
care that the child may require and whether a parent's . . .
substance abuse places the child at substantial risk of serious
physical harm.  Courts can properly take these facts regarding a
child into account, together with all other relevant evidence, in

17

deciding whether the government has met its burden at the jurisdictional stage.  But courts may *not* shortcut the inquiry envisioned by the Legislature by regarding substance abuse as constituting prima facie evidence of an inability to provide regular care to a young child and a substantial risk of serious physical harm to that child, and then look to the parent or guardian to rebut this presumption." (*In re N.R.* (2023) 15 Cal.5th 520, 559–560 (*N.R.*).)

We review the juvenile court's jurisdictional findings for substantial evidence.  "Substantial evidence is 'evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could have made the requisite finding under the governing standard of proof.' (*In re Jerry M.* (1997) 59 Cal.App.4th 289, 298.)  Under this standard 'we review the record in the light most favorable to the court's determinations and draw all reasonable inferences from the evidence to support the findings and orders.' (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 688–689.)  'We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court.' (*In re Matthew S.* (1988) 201 Cal.App.3d 315, 321.)  '[T]he trial court's ruling must be upheld if there is any basis in the record to sustain it.' (*People v. Marquez* (1992) 1 Cal.4th 553, 578.)" (*In re J.E.* (2020) 54 Cal.App.5th 309, 313–314.)

### c.      *Substantial Evidence Supported the Court's Substance Abuse Jurisdictional Findings*

The evidence established that father's substance abuse was long-standing, unmitigated, and continued throughout these proceedings, including while the children were in his care. Father had been using marijuana at least since his 2016 arrest

for possession, which he admitted was for his personal use. In December 2023 and July through September 2024, father tested positive for marijuana on every drug test administered. Even after telling the dependency investigator in mid-August 2024 (when the children were in his care), that he had stopped using marijuana, father tested positive with a high concentration of marijuana (1500 ng/mL) the next day. On September 23, 2024, father told DCFS that he was trying to stop using marijuana, but he had " 'been smoking for years, so going cold turkey is hard. I'm trying to do the right thing.' " Then, four days later, father tested positive for marijuana again with a high concentration of the drug (1480 ng/mL).

Father's substance abuse went beyond marijuana. In July 2024, he tested positive for cocaine. Although father claimed the result was from smoking a joint laced with cocaine without realizing it, the court could reasonably infer that the use was intentional given that mother reported father had a history of cocaine use. Alcohol use was also an issue. Anajulia reported father drank something from the liquor store once a week that caused him to sleep. She further observed that father's eyes were " 'red most of the time' " and that he was angry every day.

The evidence also showed that father's ongoing substance abuse directly impaired his ability to supervise and care for the children, placing them at substantial risk of harm. First, the court could infer that it impaired his judgment as father repeatedly returned the children to mother after the suicide attempt and mental health episode, and then allowed them to visit mother without a monitor in violation of court orders. In addition, while in father's care in August 2024, one-year-old Antonio sustained a sizeable burn on his arm. When DCFS

19

asked about the injury, father minimized it, saying Antonio brushed against something metal on a hot day. But when the paternal aunt pressed him on where he was when the injury occurred, father repeatedly denied knowing. The juvenile court could reasonably infer from father's evasiveness and the unexplained injury, that his drug abuse compromised his ability to safely supervise the children.

In addition, Anajulia told DCFS about how she and her sibling once found in the home's medicine cabinet a bag "that had a plant on it" containing "white circular pills." Anajulia also described father inebriating himself to the point of passing out. The court could infer from the children's access to drugs and father's weekly inebriation to the point of passing out that father's long standing drug use hampered his care of the children. This was particularly true for the two younger children, a baby and toddler, who needed constant supervision and who were most vulnerable to harm. (See *N.R., supra,* 15 Cal.5th at p. 559 ["a child's youth and maturity level can bear upon the care that the child may require and whether a parent's . . . substance abuse places the child at substantial risk of serious physical harm"].)

Even if, as father contends, the juvenile court's reference to father as a Registered Substance Abuse Offender was error, any such error was harmless. The substantial evidence outlined above independently and amply supported jurisdiction under count (b-3).

## II. No Abuse of Discretion in Ordering Substance Abuse Testing and Programs

If a child is adjudged a dependent child of the juvenile court, the court may make "any and all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of

20

the child." (§ 362, subd. (a).) The juvenile court has "wide latitude" in making such orders for the well-being of the child and "is not limited to the content of the sustained petition when it considers what dispositional orders would be in the best interests of the children." (*In re Briana V.* (2015) 236 Cal.App.4th 297, 311.) To the contrary, the court's "broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accord with this discretion, permits the court to formulate disposition orders to address parental deficiencies when necessary to protect and promote the child's welfare." (*In re K.T.* (2020) 49 Cal.App.5th 20, 25.) We review dispositional orders for an abuse of discretion. (*In re A.F.* (2024) 102 Cal.App.5th 778, 786; *In re K.S.* (2016) 244 Cal.App.4th 327, 340.)

Father contends that the trial court abused its discretion when it ordered him to undergo weekly drug testing and engage in a full substance abuse program with therapy because there was "no evidence that marijuana or alcohol use by father has ever impacted his ability to care for his children." As described in our jurisdictional analysis, the record contained ample evidence of father's ongoing substance abuse and its detrimental impact on his ability to care for the children. Given this evidence, the court could reasonably determine that addressing father's substance abuse was necessary to protect the children's well-being. The dispositional orders for drug testing and treatment with therapy were therefore well within the court's discretion.

## III. Father's Removal Challenge is Moot

Father contends the juvenile court erred when it removed the children from his care. While the appeal was pending, the children were returned to father's care. DCFS asserts this issue

21

is moot as we can no longer provide father relief since he currently has custody of the children. Father "acknowledges that the children have been returned to his custody" and does not argue the removal issue any further in reply.

We agree father's removal challenge is moot as we cannot offer him any relief. (See *D.P., supra,* 14 Cal.5th at p. 276.) We therefore do not address the merits of the children's removal.

## DISPOSITION

The juvenile court's orders are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EDMON, P.J.


We concur:



ADAMS, J.



HANASONO, J.